In re NEW YORK CITY SHOES, INC., Debtor.

RICHARD ROYCE COLLECTION LTD., Plaintiff,

v.

NEW YORK CITY SHOES, INC., Defendant.

Bankruptcy No. 87–03426S.
Adv. No. 87–0698S.

United States Bankruptcy Court, E.D. Pennsylvania.

April 6, 1988.

Edward C. Toole, Jr., Mary F. Walrath, Philadelphia, Pa., for debtor.

Rosetta Packer, Donald Harrison, Philadelphia, Pa., for Creditors' Committee.

Henry F. Siedzikowski, Colleen A. Holt, Philadelphia, Pa., for Richard Royce Collection, Ltd.

**OPINION**

DAVID A. SCHOLL, Bankruptcy Judge.

A. INTRODUCTION

The matters before us—a motion in the main case to determine whether a certain trademark licensing agreement is an executory contract and for relief under 11 U.S. C. §§ 362 and 365 flowing therefrom and the instant adversary proceeding seeking injunctive relief for breach of the aforesaid licensing agreement—require us to enter waters previously uncharted by us, i.e., the law of trademarks. We hold that, contrary to a series of arguments presented by the Debtor–Defendant, the trademarks in issue are the property of the Plaintiff rather than that of the Debtor. We further find the trademark licensing agreement to be an executory contract, although we recognize that the Debtor's course of conduct and the court-approved sale of all of the operating assets of the Debtor, including the trademarked shoes in its inventory, has rendered much of the Plaintiff's requests academic.

The only relief which we consequently shall provide is to require the Debtor to affirmatively indicate that it desires to assume the agreement and whether and what adequate protection it intends to provide to the Plaintiff or other defense to relief from the stay it intends to present within a short (10–day) period, or the agreement shall be deemed rejected and the Plaintiff shall be granted relief from the automatic stay pursuant to 11 U.S.C. § 362(d). Injunctive relief, if ever appropriate in lieu of relief from the automatic stay against a debtor, is inappropriate here due to the fact that it is no longer necessary to prevent harm which cannot be rectified by money damages at present. Further, we are unwilling to grant monetary relief on the instant record, relegating this determination to the claims process. Our hope is that, given our determination of the parties' rights in reference to the trademarks and the diminished capacity of the Debtor to pay claims against it, the parties' able counsel can amicably resolve the remaining issues among themselves.

B. PROCEDURAL HISTORY

The Debtor and eighteen other corporate entities whose cases have been consolidated therewith[1] were, at the time of the filing of this voluntary Chapter 11 case on July 7, 1987, retailers of women's shoes and related accessories. On July 23, 1987, the Plaintiff herein, RICHARD ROYCE COLLECTIONS, INC., filed the adversary proceeding before us.

On the date of filing, the Plaintiff sought an expedited hearing to prevent the Debtor from continuing to sell shoes bearing trademarks which it allegedly owned at deep-discount prices. After a hearing on July 29, 1987, we denied relief, principally because we failed to find the requisite lack of harm to the Debtor, whose sales strategy at that time was based largely on the use of such deep-discount prices of shoes, most of which included the trademarks, and would have been virtually forced, by the granting of the relief sought, to cease sales at the outset of the case. However, to accommodate the Plaintiff, we ordered broad, immediate discovery and scheduled the final hearing promptly, on August 19, 1987. However, the Plaintiff thereafter acquiesced in continuances which put off the commencement of the trial until October

1. The Creditors' Committee filed a Motion requesting us to vacate our July 24, 1987, order consolidating these cases on August 5, 1987. This motion has been continued by the Committee numerous times, and is now rescheduled for a hearing on May 12, 1988. Its importance is apparently diminished by the sale of the Debtor's operating assets.

30, 1987. The trial consumed four days, the last of which was November 20, 1987. At the close, we left composition of the briefing schedule to the agreement of the parties' counsel. Ultimately, the transcripts were not completed and filed until January 12, 1988, and the briefing was extended by agreement several times before its completion on March 22, 1988.

We are compelled to prepare our Opinion in the form of Findings of Fact, Conclusions of Law, and a Discussion by the terms of Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), although our final product is considerably more compact than the encyclopedic submissions of the parties.

## C. FINDINGS OF FACT

1. The sole owner and President of the Plaintiff is Earl Shub, an individual who identified himself as continuously involved in the shoe business from age fourteen (14) over the past twenty-five years and who ultimately became a "line builder" in the shoe industry i.e., a person who develops an idea for a line of shoes and then works with an importer or manufacturer to put the idea into production.

2. In 1982, while building lines of shoes for other companies, Shub was introduced to Barry Goldstein, Esquire, with whom he thereafter became partners in ownership of a shoe store.

3. About five months after he met Goldstein, Shub developed the concept of selling women's shoes at one price in a chain of stores and calling the stores "New York City Shoes."

4. On or about August, 1982, Shub, Goldstein, Alan Berger, and Terry Rakoff formed an association pursuant to which they owned and operated a chain of "New York City Shoe" stores. Eighteen shoe stores in which at least one of the four above-named were principals, in various configurations, were opened between 1982 and 1985 and operated as separate entities.

5. In January, 1985, the Debtor Corporation was formed and the eighteen separate corporations became one corporation. The Debtor ultimately expanded to include over fifty (50) stores which were either wholly-owned or franchised by the Debtor.

6. A separate corporation named International Fashion Footwear, Inc. (hereinafter referred to as "IFF") was incorporated on or about the end of 1984 by Shub. This corporation was the predecessor to the Plaintiff, which was formed on or about October, 1985.

7. During the period between 1982 and 1987, Shub worked as an extremely successful line-builder for the Debtor and served as the chairman of the Debtor's Board of Directors. Rakoff was the chief administrator, President, and Treasurer. Berger was the principal shareholder, and he and Goldstein were Vice President and Secretary, respectively, of the Debtor, but not involved extensively in its day-to-day operations.

8. The trademarks which are the subject of the instant Complaint were conceived and developed by Shub, and graphics for each were designed by Ken Ranaldi, an artist then on retainer with the Debtor.

9. The identity of the trademarks and, where applicable, the registrants and dates of registration of each are as follows:

| TRADEMARK | REGISTRANT | DATE |
| --- | --- | --- |
| "Richard Royce Collection" and Design | Shub | 6/3/86 |
| "Theatre Tickets" | Shub | 5/20/86 |
| "The Star Is You" and "Design Tickets" | Rakoff assigned to Shub | 5/27/86 |
| "Theatre Tickets Admit One" | not filed | — |
| "it's happening" | not filed | — |
| "Vincent Fanelli" | not filed | — |
| "it's happening by Vincent Fanelli" | not filed | — |
| "JR Exclusively Jess Robin" | Shub | 12/16/86 |

10. In January, 1985, IFF entered into an oral consulting and licensing agreement with the Debtor, which, on June 10, 1985, was reduced to a written Consultant Contract.

11. Pursuant to this contract, IFF and later the Plaintiff, through Shub, provided consulting services with respect to footwear design, merchandising and marketing, and the Debtor was licensed to use the trademarks, all of which Shub testified he had developed prior to the date of the contract. Pursuant to this contract, the Debt-

or paid IFF, and later the Plaintiff, $.25 for each pair of shoes sold.

12. Berger and Goldstein were well aware of the Consultant Contract, particularly the latter, as it was drawn up by other attorneys in his law office.

13. Shub realized approximately $700,-000.00 in revenue under the Consultant Contract in 1985.

14. Both Shub and Marc Greenstein, who was involved in purchasing for the Debtor since 1984 and was in charge of this facit of the business from July, 1987, through the hearing date, testified that a significant number of trademark shoes were sold to third parties not associated with the Debtor.

15. In August, 1986, at the impetus of Berger and Goldstein, there was a public offering of NYCS stock.

16. In contemplation of that offering, on July 24, 1986, all of the trademarks were assigned by Shub to the corporate Plaintiff.

17. In further contemplation of that offering, the Trademark License Agreement in issue (hereinafter referred to as "the TLA") was executed between the Debtor and the Plaintiff, also on July 24, 1986. Finally, also in connection with the public offering, Mr. Shub entered into an Employment Agreement with the Debtor, dated July 14, 1986.

18. Under the TLA, the Plaintiff granted the Debtor an exclusive license to use the trademarks recited in paragraph nine *supra*, most of which had also been listed in the Consultant Contract, in consideration for which the Debtor agreed to pay the Plaintiff royalties of $370,000.00 per year, payable in weekly installments of $7,211.54 each. Under the Employment Agreement, Shub was entitled to receive $125,000.00 annually. Hence, under these agreements, his compensation was $495,000.00 annually, which was a reduction from the approximate sum of $700,000.00 in compensation that Shub had received under the Consultant Contract in 1985, and hence resulted in his reluctance to agree to the public offer-

ing. However, he ultimately acquiesced due to persuasion by Goldstein.

19. Berger and Goldstein were familiar with the TLA, as were all of the attorneys, accountants and underwriters involved with the public offering. Goldstein provided legal services in connection with the drafting of the TLA.

20. The Plaintiff's ownership of the trademarks is specifically acknowledged in the TLA as follows:

The Licensee [the Debtor] acknowledges and agrees that the Licensor [the Plaintiff] owns the certain Marks covered by this License Agreement. The Licensee acknowledges that the Licensor has exclusive right, title, and interest in and to said Marks. Licensee will not at any time do or cause to be done any act or thing contesting or in any other way impairing or intending to impair any part of such right, title or interest. The Licensee will not in any manner represent that it has an ownership interest in the Marks or registration thereof, and the Licensee acknowledges that the use of the Marks shall not create in the Licensee's favor any right, title or interest in or to the Marks. Licensee agrees that all use of the Marks by the Licensee shall inure to the benefit of the Licensor.

21. The Debtor issued a Prospectus in connection with the public offering, which acknowledged the Plaintiff's ownership of the trademarks and the validity of the TLA in numerous passages.

22. Shortly after the Chapter 11 case was filed, Berger and Goldstein discharged Rakoff, installed Berger as President, terminated Shub from his position with the Debtor, refused to honor the Employment Agreement or the TLA, and made no further payments to Shub or the Plaintiff.

23. Immediately thereafter, the Debtor began sales of the trademarked shoes at deep discounts well below cost in order to raise cash quickly. Shub and the Plaintiff contended that this undertaking destroyed the value of the trademarks, and attempts to stop this practice were the impetus of the Motion for a preliminary injunction in this proceeding.

24. Rakoff, whose conduct is the subject of a separate adversary proceeding brought by the Debtor in which he, his wife, and his mother are named as defendants, at Adv. No. 87–0705, was called as a witness by the Debtor, but refused to answer any questions, invoking the fifth amendment in response to every inquiry.

25. Much of the Debtor's case consisted of attempts to show financial improprieties in the administration of the Debtor and to implicate Shub in same. For example, numerous checks which were drawn to Shub or other entities related to him or controlled by him were produced. The Debtor also attempted to establish profiteering by Shub in transfers of franchises owned in part by Shub to the Debtor.

26. We do not find that Shub had either the business acumen or the inclination to be involved in any schemes to cheat the Debtor. Although somewhat ostentacious and expressing what we believe to be an exaggerated sense of his self-importance, Shub was a credible witness and we therefore believe his denials of unproven allegations of dishonesty on his part.

27. Both Shub and Berger revealed difficulty in reading even rather simple printed material. Therefore, we conclude that the literacy of each is limited and we conclude that neither had any degree of sophistication in financial matters.

28. On the other hand, it appears quite apparent that all schemes to profiteer from the Debtor emanated from or were orchestrated by Rakoff. The lack of business acumen of both Shub and Berger and the negligence and misplaced trust in Rakoff expressed by Shub, Berger, and Goldstein were responsible for apparently allowing Rakoff to effect such schemes.

29. The presence and significance of the pre-public-offering Consultant Contract and the TLA were certainly known to Goldstein. Berger, like Shub, was generally aware of the presence and significance of same, but lacked knowledge of the finer legal points associated with these matters. However, neither Berger, nor Goldstein, nor any party, including counsel handling the trademark applications hired by the Debtor and hence presumably protecting its interests, Robert S. Lipton, Esquire, ever questioned the validity of these arrangements until after the bankruptcy was filed and the contracts with Plaintiff and Shub had already effectively been unilaterally repudiated by the Debtor.

30. Although any value of the trademarks has been decimated between July, 1987, and the present, this was due in large part to the financial collapse of the Debtor, which was caused by the dishonest dealings of Rakoff and the failure of the other principals of the Debtor, including Shub, to carefully monitor his conduct. Therefore, these losses to the Plaintiff must be attributed, at least to some degree, to Shub himself.

31. On February 1, 1988, this court approved a sale of substantially all of the Debtor's assets to the Orient River Investment, Ltd. for $1,050,000.00, plus sale of all inventory, including some trademark shoes, for a formula which was projected to result in a below-cost transfer of same for an additional sum of between $1.2 million and $1.4 million.

## D. CONCLUSIONS OF LAW

1. The TLA is valid and enforceable by the Plaintiff. The presumption of validity of the registrations of those trademarks which were registered is not overcome by the Debtor, since the Agreement was negotiated with all of the other principals of the Debtor and their counsel.

2. All of the trademarks in issue, including those which were not registered, were used first in commerce by the Plaintiff. Further, the Debtor, having licensed the trademarks from the Plaintiff, is estopped from denying its ownership of them.

3. All of the trademarks in issue are therefore the property of the Plaintiff.

4. There is insufficient evidence that either the Plaintiff or Shub is chargeable with usurping corporate opportunities in entering into the TLA, since this document was drafted by the Debtor, its principals, and its counsel, and its presence and significance was well-known to all of them.

5. Since the TLA was not repudiated or in any other way terminated prior to the bankruptcy filing, it is an executory contract within the scope of 11 U.S.C. § 365.

6. In light of the Debtor's unilateral repudiation of the TLA and its cessation of business, it seems apparent that the Debtor would opt to reject the Agreement if given a choice and would be unable to provide adequate protection to the Plaintiff. Therefore, the Debtor will be accorded but ten (10) days to accept or reject the TLA, and offer adequate protection to the Plaintiff, or the TLA will be deemed rejected and relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), will be accorded to the Plaintiff.

7. No other relief is warranted. The Debtor's present inactive status precludes the Plaintiff from obtaining any but monetary relief at present. However, particularly given the lack of completeness of the record on this point, disposition of monetary damages are properly relegated to the claims process.

## E. DISCUSSION

1. *The Debtor's Case is Based on the Theory that Shub has Been Dishonest and Opportunistic in His Dealings with the Debtor, a Conclusion which We Decline to Make.*

The initial Conclusion of Law which the Debtor asks us to make is the application, to assessment of the testimony of Shub, of the doctrine *falsus in uno, falsus in omnibus,* i.e., if a witness is established to have uttered certain falsehoods, then all of that witness's testimony may be discredited. The Debtor argues that, since some aspects of Shub's testimony should be disbelieved, we should disregard that portion which clearly supports his contention that the Plaintiff owns the trademarks. There is also an attempt to link Shub with the apparent profiteering of Rakoff, and the suggestion that Rakoff's invocation of the fifth amendment permits us to draw adverse inferences as to Shub.

As our Findings of Fact indicate, our global perception of the Debtor's operational downfall and the role of Shub in same differ rather sharply from that suggested by the Debtor. While we found Shub to be somewhat ostentacious and guilty of exaggerating his own self-importance, we refuse to find him dishonest and credited most of his testimony, much of which was unrebutted due to apparent gaps in the Debtor's records. The record made in this proceeding strongly suggests that the dishonest element in the Debtor's operation was confined to Rakoff. Unfortunately, because of a complete lack of internal controls to uncover Rakoff's activities, Shub, Berger, and Goldstein, and the Debtor became his common victims.

This is not to say that we have copious sympathy for any of these parties. As long as money flowed into their pockets, none of them displayed any particular concern about the operation of the financial end of the business, and thus they all allowed Rakoff the autonomy necessary to do what he liked without detection. When the house of cards assembled by Rakoff began to crumble and they attempted to piece together the business upon Rakoff's departure, none of these parties were able to do so. Berger and Goldstein, the two less active members of the operation, awakening from their slumber, drew together and swept out Shub with Rakoff, on the apparent assumption that Shub's intense involvement in the business must have caused him to have been aware of Rakoff's activities. They may well have thrown out the baby with the bath water.

Significant in our perception of the Debtor's affairs is our observation that Shub's very literacy is marginal. He certainly did not present as a mastermind, but rather as a dupe, so wrapped up in his line-building that he never detected any of Rakoff's destructive activities despite his proximity to them.

Meanwhile, Berger, thrust into the presidency of the Debtor in the wake of the departure of Rakoff and Shub, also displayed marginal literacy and a total lack of affinity for the shoe business. Goldstein, a learned individual who, of all of the Debtor's other principals, should have been

most capable of uncovering Rakoff's activities, showed no particular interest to do so when times were good and no affinity for the shoe business as was necessary to revive the Debtor when times quickly became bad.

The initial deep-discount sales of shoes including the trademarks does not appear to us to have been motivated to obtain retribution against Shub, as Shub apparently supposed. Rather, they represented desperate and doubtful management decisions by Berger and Goldstein. The trademarks, which may or may not have contained the magic of success which Shub attributed to them, were undoubtedly scarred beyond resuscitation by the demise of the Debtor to whom they were linked. However, we believe that the Debtor's failure was the responsibility of Berger, Goldstein, and Shub, in equal parts, for allowing Rakoff to proceed to cripple the business without detection. All impressed us as honest and well-meaning. None impressed us with his vigilance or business acumen.

Despite an attempt to hire competent post-petition management personnel, such as Elliot Goldman, the Debtor's operation, now minus Shub's golden touch as a line builder, reverted to a straight downhill path which caused it to be liquidated. Shub's partial victory in this litigation is thus perhaps no more than a symbolic sop to his vanity, which is perhaps all that he could expect. However, it is largely meaningless from an economic standpoint, as there is little meat left on the Debtor's bones to pick at this point.

However, given this overview, we are not impressed with the Debtor's efforts to implicate Shub in dishonesty or fraud. We believe that he did develop the concept of New York City Shoes and the lines which become the trademarks in issue. Whether this was genius or luck can be debated. However, from the outset of the development of the Debtor in 1982, most of the trademarks were in use. Shub developed them for the Debtor, but it is apparent that, in at least some quantity, trademarked shoes were sold to other unrelated stores from the outset.

We cannot say that Shub's assertion that the trademarks were his was fraudulent. Rather, it appears to have been a mutual decision of all four of the Debtor's principals that Shub would be the registrant and deemed the owner of the registered and unregistered marks as one means of compensating him for his services. The legal aspects of the trademark issues will be discussed hereinafter at pages 955–58 *infra*. However, at this point, we merely emphasize that we find no fraud in Shub's applications for the trademarks. The only indicia of fraud at any point in the registration process was Rakoff's attempt to register the trademark "The Star Is You" in his own name. However, this action of Rakoff was apparently too close to Shub's particular sphere of activities to avoid detection, and Shub apparently insisted that it be assigned to him, which it was.

The fact that certain franchises were originally owned by Shub and sold to the Debtor with write-offs of its debts does not prove fraud. Shub testified that all sales of stores opened by the four principals of the Debtor and subsequently sold to the Debtor were handled in similar fashion. We believe that such business dealings were beyond Shub's particular sphere of influence and, frankly, over his head. In the Debtor's days of wine and roses, apparently anything went, and none of the Debtor's four principals were overly concerned about legal technicalities or paper trails.

The Debtor produced certain checks drawn to Shub and his son's trust without apparent explanation. Shub claimed that these were repayments for improperly-documented loans. Given the shambles of the Debtor's financial records, we have no proof either way. Given our perception of Shub and the Debtor, we are not inclined to disbelieve Shub on this point.

Bogus checks were clearly drawn to the Kaplan Shoe Company, a small company which the Debtor allowed to store its inventory in its warehouses, and endorsements on checks included obvious forgeries of the names of its principal, Jay Kaplan. There is, however, no evidence to link these activi-

ties to Shub. It is far more likely that they emanated strictly from Rakoff.

In sum, the Debtor's case is based upon the premise that we will find Shub to be responsible for or implicated in the above and other financial irregularities in the Debtor's business. Our refusal to do so undermines much of the force of the Debtor's arguments.

2. *The Debtor has Failed to Overcome the Presumptive Validity of the Plaintiff's Ownership of the Trademarks.*

■■■ The parties do not dispute that, of the trademarks in issue that were in fact registered with the United States Patent Office, they were initially registered to Shub and thereafter assigned to the Plaintiff. The only exception was "The Star Is You" which was inexplicably registered by Rakoff, but was later assigned to Shub. Registration of trademarks is significant because registration is considered *prima facie* proof of the legal ownership of a trademark. 15 U.S.C. § 1057(b). *See, e.g., Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327, 1336 (E.D.Pa.1976). While registration does not of itself create rights to a trademark if such rights did not exist prior to registration, it does create a rebuttable presumption that the registrant is in fact the legal owner of the trademark. *General Business Services, Inc. v. Rouse*, 495 F.Supp. 526, 533 (E.D.Pa.1980).

■■■ This presumption of ownership may be rebutted by a party claiming and proving adverse ownership. However, the presumption shifts both the burdens of proof and of persuasion to the adverse party. *Rick v. Bochansky*, 609 F.Supp. 1522, 1531 (S.D.N.Y.1985). In the instant case, therefore, the burden was clearly upon the Debtor to persuade us that it and not the Plaintiff or its assignor, Shub, is the legal owner of the contested trademarks.

■■■ Several of the trademarks were not registered at all. However, it is clear that the Lanham Act protects common law trademark rights as well as registered marks. *See, e.g., G's Bottoms Up Social Club v. F.P.M. Industries, Inc.*, 574 F.Supp. 1490 (S.D.N.Y.1983). We are not requested by either party to treat any particular trademark, whether registered or unregistered, differently from any other. We are inclined to treat them all the same in ruling on the ownership of them. Therefore, the presumption arising from registration of some of them runs in favor of them all.

■■■ The Debtor based its claim of ownership on the holdings of the courts in *Smith v. Coahoma Chemical Co.*, 264 F.2d 916 (C.C.P.A.1959); *G's, supra;* and *Daytona Automotive Fiberglass v. Fiberfab, Inc.*, 475 F.Supp. 33 (W.D.Pa.1979). In these cases, the courts developed a principle that a trademark developed by an employee, while acting in the scope of his employment, is the property of the employer that actually uses it. This presumption follows from the principle that a mere conception of a design or trademark, without actual use of same in connection with a trade or business by the party conceiving it, is insufficient to establish ownership. *See Smith, supra; G's, supra;* and *Montgomery v. Kalak Water Co.*, 196 F.Supp. 173 (S.D.N.Y.1961). Therefore, when a trademark is conceived by an employee of a company, for use by that company, rights to the trademark accrue to the business using it, not to the employee who designed it. *G's, supra*, 574 F.Supp. at 1495–96. Here, the Debtor contends that Shub developed the trademarks while an employee of the Debtor. Following from this, it argues that it, and not Shub or the Plaintiff, actually first used the trademarks in commerce, and hence that ownership of the trademarks should accrue to it.

■■■ In establishing ownership of a trademark, it is a basic tenet that trademark ownership depends on whether a party had both actual and first use of the mark. *See, e.g., Rouse, supra*, 495 F.Supp. at 533. It is priority of trademark use, in commerce, that confers ownership upon the user. *Id.* "Use" is defined as affixing the trademark to the goods, and selling or transporting the marked goods in commerce. *See, e.g., New England Duplicat-*

*ing Co. v. Mendes*, 190 F.2d 415, 417–18 (1st Cir.1951). The Debtor's claim to first use depends upon a finding that it and not Shub first sold the trademarked goods, and that Shub's activities in this regard inured to the benefit of the Debtor as his employer.

■ The Debtor fails in this argument, primarily because its embrace would require us to discredit the credible testimony of Shub contending that he had made a use of the trademarks prior to that of the Debtor. Not only have we found that Shub personally conceived and developed the trademarks, with assistance from Mr. Ranaldi only in the area of graphic design for his ideas, but we also found that he sold a significant number of trademarked shoes apart from sales to the Debtor. See Findings of Fact 8, 14, at pages 950, 951 *supra*. Per Shub's testimony, he and the Plaintiff sold trademarked shoes to stores owned by the Debtor, franchised stores, *and* to other unaffiliated shoe stores prior to the time that he entered into the TLA in issue with the Debtor. The testimony of the Debtor's own witness, Marc Greenstein, supported these contentions as to the sales patterns of Shub and the Plaintiff, at least since the middle of 1986, and there is no reason to assume different sales patterns at an earlier date. These sales, per Shub, also occurred before he entered into the employment contract with the Debtor. In fact, such sales were reported years before the incorporation of the Debtor in its present form in 1985. The fact that these sales were not to consumers, but to retailers, does not signify that they were not sales "in commerce." *See Blue Bell, Inc. v. Farah Manufacturing Co.*, 508 F.2d 1260, 1265 (5th Cir.1975). These sales certainly qualify as a "use in commerce" under the present facts because a line builder in the shoe industry like Shub ordinarily would sell to retailers, not to consumers.

■ In the alternative, the Debtor also contends that Shub, as a shareholder of the Debtor, could not legally develop the trademarks in his individual capacity or as the agent of the Plaintiff, but only as the agent of the Debtor. The most anatagous precedent is *El Sombrero Corp. v. Bolivar*, 106 Ill.App.3d 925, 62 Ill.Dec. 707, 436 N.E.2d 733 (1982), that wherein it was held that a major shareholder of a corporation, who devised a logo used exclusively by the corporation for several years, could not legally assign the logo in his individual capacity despite his subsequent state registration of the trademark in his name. However, the facts of the present case are clearly distinguishable from those of *El Sombrero*. First, Shub and/or the Plaintiff established independent first use of the marks, invalidating the Debtor's claim to exclusive use of them. In addition, Shub credibly testified that he did not act exclusively for the Debtor in his line-building activities, despite his position as a major shareholder and director of the Debtor. Rather, he contended that he, as well as the other three principals of NYCS, "wore many hats," i.e., they engaged in several diverse activities within and without the scope of the Debtor's activities, with the knowledge and approval of the other principals, who did likewise. In Shub's case, in addition to his activities on behalf of the Debtor, he continued in his individual capacity as a line-builder, designing and importing shoes, and selling trademarked shoes to franchised stores and unrelated third parties, until the post-filing period. Moreover, his independent status, both before and after his entering into the TLA and his Employment Contract with the Debtor, was not questioned by any of the other principals of the Debtor. The very existence of and apparent need for these agreements underscores his prior independence.

Finally and most conclusively, it is the very existence of the TLA that totally defeats the Debtor's claim of first use. In *Turner v. HMH Publishing Co.*, 380 F.2d 224 (5th Cir.1967), interpreting the Lanham Act, the court found that use of a trademark by a licensee inures to the benefit of the licensor if the licensor is the registrant, and the licensor maintains control over the quality of the trademarked goods. Here, Shub registered some of the trademarks, and assigned all of them to the Plaintiff. By the terms of the TLA, Shub had quality

control over the trademarked goods and he testified, without rebuttal, that he exercised same through his exclusive quality-control inspections of all trademarked goods shipped to the Debtor. Therefore, as long as Shub established first actual use of the trademarked goods to effectuate a valid registration and/or common-law claim thereto, which we have found to be the case, any use of the trademarks by the Debtor inured to the benefit of Shub and the Plaintiff.

Additional support for this position can be found in *Floater Vehicle, Inc. v. Tryco Manufacturing Co.*, 497 F.2d 1355 (C.C.P.A.1974). There, the court found that an employee did not give up pre-existing trademark rights when he entered into an employment contract with his employer. Instead, the court determined that the employer's use of the trademark had been pursuant to an oral licensing agreement, and that the employer's use of the trademarks inured to the employee/licensor. Thus, as in *Floater*, the Plaintiff's claim of ownership is strengthened by the fact that the Debtor licensed the use of the trademarks from Shub and, later, the Plaintiff.

Finally, several cases have held that a licensee is equitably estopped from setting up a subsequent adverse claim against its licensor. *Professional Golfers Ass'n v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir.1975); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326 (6th Cir.1973); *Pacific Supply Cooperative v. Farmer's Union National Exchange, Inc.*, 318 F.2d 894 (9th Cir.1963); and *E.F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512 (6th Cir.1943). In *Professional Golfers, supra,* for example, the court stated that a licensee is estopped by its prior recognition of a trademark's validity. 514 F.2d at 671. Thus, in the instant case, the Debtor entered into the TLA with the Plaintiff, thereby expressly acknowledging the Plaintiff's ownership of the trademarks, and proceeded to pay royalties to Shub and, later, the Plaintiff, from January, 1985, to July, 1987. Having clearly indicated that it considered itself bound by the licensing agreements for two and a half years, the Debtor should

be and we hold is estopped, at this late date, from challenging the very ownership of the trademarks by Shub and the Plaintiff, which were the very basis of these agreements.

The Debtor also argues that the trademark registration itself was fraudulent, and is therefore invalid. Because it contends that the trademark registration itself was invalid, it argues that the TLA should be found to be void *ab initio*. The factual underpinning of this argument is the claim that Shub lied to the United States Patent Office by reciting therein that he and not the Debtor was the first user of the trademarks. We decline to find that Shub falsified these applications. Rather, their contents reflect the consensus of all of the four principals of the Debtor at the time as to what was proper regarding the registrations, and all were well aware of the facts, if not all of the legal ramifications, of so doing. It ill befits the Debtor's two remaining principals to offer a revisionist interpretation of the attendant circumstances at this belated juncture.

Furthermore, this court has already determined that Shub (and the Plaintiff) were legitimately designated as the first users of the trademarks, and that their use was further established by the Consulting Contract and, later, the TLA in issue. It should be noted that even a token use in commerce is enough to support a registration if this use is pursuant to a bona fide business transaction. *See Mendes, supra,* 139 F.2d at 415–16. *See also, Turner, supra;* and *Florida v. Real Juices, Inc.,* 330 F.Supp. 428 (M.D.Fla. 1971). Thus, absence of a high volume of pre-registration sales is not fatal to a valid registration. Even a minimal showing of sales by Shub would have been sufficient to support a valid registration, and such a showing has been made here.

In summary, we find that the Debtor has failed, under all or any of its imaginative theories, to sufficiently shake the presumption flowing from the registration of some of the marks by Shub, as assignor to the Plaintiff, or by the Plaintiff itself. The TLA recites the consensus that all of these

marks are to be considered as the Plaintiff's property. We therefore conclude that the trademarks in issue are the property of the Plaintiff.

3. *Given the Negotiated Resolution of the Rights of Shub and the Plaintiff Vis–A–Vis the Debtor with the Debtor's Principals, the Debtor has Failed to Show a Usurpation of Corporate Opportunity by Shub and/or the Plaintiff.*

The Debtor also claims that Shub usurped corporate opportunities of the Debtor to himself in negotiation of the TLA for his own benefit. The difficulty in attributing this usurpation to the corporate Plaintiff is leapt over by arguing that this court should pierce the Plaintiff's corporate veil and attribute the acts of Shub to the Plaintiff.

The underpinnings of the legal theory of the Debtor as to this point are clear. In *Harper v. Superior Tool & Die Co.*, C.A. No. 86–4188, slip op. at 10–12 (E.D.Pa. Oct. 7, 1987) [available on WEST-LAW, 1987 WL 18414]; *Enterra Corp. v. SGS Associates*, 600 F.Supp. 678, 684–87 (E.D.Pa.1985); and *In re Athos Steel & Aluminum, Inc.*, 71 B.R. 525, 540–41 (Bankr.E.D.Pa.1987), these theories are well-articulated by Judge Broderick of our district court and Judge Fox of this bankruptcy court, respectively. Officers and directors of a corporation stand in a fiduciary relationship to the corporation which they control and/or manage. This fiduciary relationship imposes upon them a duty of loyalty to the corporation and a duty of care to exercise ordinary diligence, care, and skill in discharging management duties. A failure to perform these duties renders them liable to the corporate shareholders harmed by their actions. As *Harper* indicates, corporate directors in even close, family-owned corporations are liable if they act in such a way as to profit their individual and other corporate enterprises at the expense of the corporation in issue.

The Debtor argues that Shub's registration of the trademarks in his own name, as well as his alleged diversions of funds,

write-offs of obligations of his franchises to the Debtor, and sales of shoes bearing the trademarks (which the Debtor claims are rightfully its property) are all actionable corporate wrongs by Shub, attributable to the Plaintiff. We have already discussed at length our conclusion that certain of the trademarks were legally registered in the name of Shub, and that the trademarks are rightfully the Plaintiff's property. We have also indicated that the claims of miscellaneous profiteering by Shub at the expense of the Debtor are unproven as either having emanated from Shub or having accrued to his benefit. Thus, we are not prepared to accept these claims of the Debtor.

In addition, we think that certain aspects of the Debtor's history totally negate the inference that the particular existence of the TLA constituted profiteering by Shub or the Plaintiff at the Debtor's expense. In 1985, Shub realized income of over $700,000.00 from the operation of the Consultant Contract then in place. The TLA and Employment Agreement were not conceived by Shub, but rather, apparently, by Berger and Goldstein to further their own and/or the Debtor's ends in connection with the public offering. Shub's personal income was therein capped at $495,000.00, a substantial sum which we might instinctively feel is excessive but for the fact that it effected a reduction of his 1985 income under the Consulting Contract by over $200,000.00, or almost one-third. Shub testified, without rebuttal from Berger or Goldstein, that the public offering was certainly not *his* idea. The Prospectus and other documents drafted in contemplation of the public offering were drawn up not by Shub or his counsel, but by counsel representing Berger or Goldstein or the Debtor. The trademark applications were filed not by Shub's personal counsel, but by the Debtor's trademark-law counsel, Mr. Lipton. The Debtor wishes us to infer from the utilization of its counsel that the trademarks are the property of the Debtor. Actually, we infer precisely the opposite: that the use of the Debtor's own counsel was a device which we would have expect-

ed would have protected its interests from any unfair advantages which might be taken of same by Shub.

All of the foregoing strongly suggests that the resulting contractual agreements are unlikely to be rife with aspects unfairly benefiting Shub or the Plaintiff at the expense of Berger, Goldstein, or the Debtor. We therefore conclude that the instant factual setting is a most infertile basis from which to draw a conclusion that Shub or the Plaintiff unfairly usurped corporate authority or diverted corporate opportunities to their own ends. Rather, the TLA and Employment Agreement bear the marks of a rational distribution of his share of the fruits of the Debtor's profits to Shub, agreed upon by all of the Debtor's other major shareholders and management and effectuated by the Debtor's own counsel. The post-petition repudiation of the benefits conferred upon Shub by Berger and Goldstein has the mark of expediency conceived by the sudden discovery of the destructive nature of Rakoff's actions and the need to eliminate, whether rightly or wrongly, all of the Debtor's financial commitments which appeared to stand in the way of survival.

4. *The Bankruptcy Law Consequences of the Foregoing: The Trademark Licensing Agreement is an Executory Contract which the Debtor is Unlikely to Assume, and Relief from the Automatic Stay, Although No Other Relief, may be Accorded to the Plaintiff.*

Having completed our excursions into analysis of the particular Debtor's financial difficulties and into the previously uncharted (by us) territory of trademark law, we now return to more familiar bankruptcy law concepts to determine what relief can be properly accorded to the Plaintiff. Ironically, counsel in this case, though experienced bankruptcy practicioners, have provided us little or no analysis on these issues.

Perhaps they were dazzled by the exotic trademark-law issues presented by this case.

In our original colloquy with the Plaintiff's counsel, on July 29, 1987, we questioned the propriety of the relief sought—an injunction against the Debtor—from a bankruptcy context. As Judge Fox of this court recently articulated in two cases where he declined to issue a turnover *against* debtors, "a motion for relief [from the automatic stay] is not designed to short circuit nonbankruptcy procedural and substantive requirements" and that only "in certain narrow circumstances" where "policy considerations dictate," should a bankruptcy court grant a non-debtor injunctive relief against a debtor as opposed to relief from the automatic stay. *In re Munoz, Grimes v. Munoz,* 83 B.R. 334, 338 (Bankr. E.D.Pa.1988); and *In re Moore & White,* 83 B.R. 277, 284 (Bankr.E.D.Pa.1988). *Compare* 11 U.S. § 542, authorizing a trustee (or debtor-in-possession) to *obtain* a turnover order of property of the estate against third parties.

An ongoing trademark violation by a debtor could conceivably justify injunctive relief against it, from a bankruptcy court. *Cf. In re Vylene Enterprises, Inc.,* 63 B.R. 900, 905–07 (Bankr.C.D.Cal.1986) (automatic stay does not apply to a proceeding in bankruptcy court). *But see In re Lessig Construction, Inc.,* 67 B.R. 436, 443–44 (Bankr.E.D.Pa.1986). However, here, the Debtor's cessation of business and the transfer of all of its assets, including the trademarked shoes in its inventory, to Orient River Investments, Ltd., eliminates the urgency of such relief.[2] In fact, this transfer eliminates the presence of the element that the Plaintiff may face the prospect of harm which cannot be adequately compensated by monetary damages, which is a necessary condition for the granting of any equitable, injunctive relief. *See e.g., City of Los Angeles v. Lyon,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 1670–71, 75 L.Ed.2d 675

**2.** In approving the sale, we did require, at the request of the Plaintiff, that, in making up the audit of the inventory of shoes transferred to Orient River Investments, Ltd., the parties to the sale must identify the trademarked shoes transferred and provide the tabulation of same to the Plaintiff. Presumably, this will enable the Plaintiff to trace the trademarked shoes in the hands of the buyer if it deems it worth its while to do so.

**960**

(1983); and *Grant v. Cohen,* 630 F.Supp. 513, 520 (E.D.Pa.1985).

The four corners of the Complaint do not request monetary damages, even though the Plaintiff, in its post-trial submissions, asks us to award it such damages just as if it did. However, we would not, in any event, deem such an award appropriate here at this juncture. Damages to a claimant, for either pre-petition obligations or post-petition administrative expenses such as are in issue here, should normally be relegated to the bankruptcy claims process. *Cf. In re International Endoscope Manufacturers, Inc.,* 79 B.R. 620, 621 (Bankr.E. D.Pa.1987). The Plaintiff, as well as Shub and his wife and his son's trust and other entities controlled by him, have filed timely Proofs of Claim, in apparent acknowledgement of same. Furthermore, the evidence of damages on the record here is spotty. Now that the validity of the TLA has been upheld, it is conceivable that the parties could agree on a sum which would constitute these claims, especially given the depleted state of the Debtor's estate, promising a relatively modest payment dividend.

However, apparently in response to the colloquy of July 29, 1987, the Debtor also filed what it termed a Motion for Finding That Trademark License Agreement Is Non-Executory, or if Executory, for Relief from Stay, or Adequate Protection Payments and Fixing of Time Within Which Agreement Must Be Assumed or Rejected. This motion appears to encompass all relief to which the Plaintiff could be entitled under the Bankruptcy Code.

No reason or reasoning is given to support the conclusion that we should consider the TLA to be non-executory. It certainly appears to fit either the classic "executory contract" definition of a contract that has not been fully performed on both sides, or by either of the parties thereto. *See, e.g., In re Cherry,* 78 B.R. 65, 68–69 (Bankr.E.D.Pa.1987); and *In re W. & L. Associates,* 71 B.R. 962, 964–66 (Bankr.E. D.Pa.1987). Clearly, the contract in issue was not terminated pre-petition, nor had it been the subject of a pre-petition decree of specific performance, as was the case with the contract in issue in *Cherry.* The Debtor therefore has the right to either assume or reject the contract, pursuant to 11 U.S. C. § 365(d)(2), prior to confirmation of a reorganization plan.

It might be argued with some force that the Debtor's course of conduct effectively constituted a rejection of the contract. The Debtor repudiated the contract and has, in this action, argued its total invalidity *ab initio* and, consequently, at all times post-petition. The Debtor is now shorn of its operating assets and is in no apparent position to assume the contract in any event. It is difficult to imagine a series of words and deeds less compatible with assumption of the TLA than the Debtor has exhibited to date.

However, we are not certain that we can recognize an implicit rejection of an executory contract in any circumstances. In all fairness to the Debtor, it would have been inconsistent for it to have assumed or rejected this agreement, while at the same time vigorously arguing that it was totally null and void. We therefore believe that the preferable and conservative course of action is to allow the Debtor a very brief period to assume the contract, or otherwise we shall deem it rejected. Given the present circumstances, which point almost conclusively to a rejection, we shall allow the Debtor, pursuant to 11 U.S.C. § 365(d)(2), only a specified period of about ten (10) days in which to affirmatively assume the contract, or we shall deem it rejected. *Compare In re Grant Broadcasting of Philadelphia, Inc. (Fourth Opinion),* 71 B.R. 891, 901–02 (Bankr.E.D. Pa.1987).

Especially as we are unwilling to grant any injunctive relief against the Debtor here ourselves, we believe that relief from the automatic stay is warranted, either under 11 U.S.C. § 362(d)(1) or 11 U.S.C. § 362(d)(2). We reiterate that we have held that relief under § 362(d) can be granted to an obligee under an executory contract, contrary to the holdings of some courts that such relief is confined to remedies contained in 11 U.S.C. § 365. *See In*

*re Fox, Fox v. Hill*, 83 B.R. 290, 292 (Bankr.E.D.Pa.1988); and *Grant Broadcasting, supra*, 71 B.R. at 900–01. However, we will accord the Debtor until April 18, 1988, to indicate what adequate protection it will provide to the Plaintiff, or to articulate any defenses it might have to a § 362(d) motion. *Compare In re New York City Shoes, Inc.*, 78 B.R. 426, 432–33 (Bankr.E.D.Pa.1987) (same Debtor permitted a short period to provide adequate protection to a bank whose interests in a deposit were disputed and not resolved prior to this court's Opinion).

An Order setting forth the relief described herein will be entered.

## ORDER

AND NOW, this 6th day of April, 1988, after five days of trial from July 29, 1987, through November 20, 1987, and several submissions from both parties in reference to the Motion of Richard Royce Collections, Ltd. (hereinafter referred to as "Royce"), for Finding that Trademark Agreement is Non-Executory or, if Executory, for Relief from Stay, or Adequate Protection Payments and Fixing of Time Within Which Agreement Must Be Assumed or Rejected, in the above main case and in the above adversary proceeding, it is hereby ORDERED AND DECREED as follows:

1. Royce's Motion is GRANTED in part.

2. The Trademark Licensing Agreement (hereinafter referred to as "TLA") is determined to be an executory contract.

3. The Debtor shall indicate, by written motion to be filed and served on or before April 18, 1988, whether it wishes to assume the TLA, and, if so, what adequate protection it shall provide or what other defenses it has, if any, to relief from the stay on behalf of Royce.

4. If the Debtor does not proceed as per paragraph three, the TLA shall be deemed rejected and Royce shall be granted relief from the automatic stay to pursue any remedies to enforce the TLA, exclusive of monetary damages, effective April 19, 1988.

5. If the Debtor does proceed as per paragraph three, a hearing on the motion shall be conducted on

WEDNESDAY, APRIL 27, 1988,
at 10:00 A.M.

in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

6. No other relief shall be awarded to Royce in either the adversary case or on its Motion.