**In re NEW YORK CITY SHOES, INC., Debtor.**

**NEW YORK CITY SHOES, INC., Plaintiff,**

v.

**BEST SHOE CORP. and First Footwear Corp., Defendants.**

**Bankruptcy No. 87–03426S. Adv. No. 88–2294S.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 14, 1989.

Pauline K. Morgan, Mary F. Walrath, Douglas J. Smillie, Philadelphia, Pa., for debtor/plaintiff.

Bradley K. Moss, L.J. Lichtenstein, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for defendant.

## ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. FINDINGS OF FACT

1. The Plaintiff in this proceeding is NEW YORK CITY SHOES, INC. (hereinafter referred to as "the Debtor"), a debtor-in-possession in the instant Chapter 11 bankruptcy case, filed on July 7, 1987.

2. On December 7, 1988, the Debtor instituted the instant adversary proceeding against BEST SHOE CORP. (hereinafter "Best") and FIRST FOOTWEAR CORP. (hereinafter "1st Footwear") (collectively Best and 1st Footwear are referred to as "the Defendants"), pursuant to 11 U.S.C. § 547 of the Bankruptcy Code, seeking the recovery of allegedly preferential payments made by the Debtor to Best totalling $178,544.15, $3,600 of which was allegedly subsequently transferred from Best to 1st Footwear. The matter was tried on March 22, 1989, and, thereafter, the parties submitted Memoranda of Law supporting their respective positions.

3. At the outset of the trial, the parties presented a jointly-prepared Stipulation of Facts with respect to the transfers at issue. Therein, the parties stipulated to the Defendants' liability as to all but a $100,000 payment made by the Debtor to Best on April 15, 1987. The substance of the Stipulation was that $30,000 of the remaining payments totalling $78,544.25 were preferential and that Best did indeed transfer $3,600 of the $30,000 for which it was liable to 1st Footwear, rendering the latter party liable for this sum.

4. As to the $100,000 payment, the parties agreed that all elements of a preference set forth in 11 U.S.C. § 547(b) were made out except for the Defendants' dispute that a "transfer of the interest of the debtor in property" was made. On this point, the Defendants argued that the "earmarking" doctrine excluded this payment from avoidance.

5. Alternatively, Best contended that six shipments of shoes by Best to the Debtor on April 16, 1987, valued at a total of $35,163.90, constituted "new value" excluding this portion of the $100,000 payment from avoidance, pursuant to 11 U.S.C. § 547(c)(4).

6. At trial, the Debtor's Financial Management Consultant and Custodian of Records, accountant George L. Miller, testified that the $100,000 payment on April 15, 1987, was made for and on account of antecedent debts owed by the Debtor to the Defendants, which, on that date, exceeded $195,000, and was not applied, on the books and records of either company, as a payment for any future shipments, including those on April 16, 1987.

7. With respect to Best's records, Miller's main point of reference was an account ledger, attached to its proof of claim in the amount of $317,438.60, filed on July 21, 1987, on which the notation "a" was indicated in the listing of a payment in the amount of $35,154.05 by the Debtor on April 7, 1987 (which payment the parties agreed had preceded the preference period and was not avoidable), and the same nota-

tion "a" appearing on the six shipments on April 16, 1987. Miller logically concluded that these notations were meant to document that the payment of April 7, 1987, was specifically intended to be a pre-payment for the April 16, 1987, shipments.

7. In addition to Miller, the Debtor's only other witness was Earl Shub, the former Secretary and Chairman of the Board of the Debtor. The facts surrounding Shub's ouster just after the Debtor's bankruptcy filing and the ramifications thereof are chronicled in our Opinion of April 6, 1988, in Adv. No. 87–0698S in this case, reported at 84 B.R. 947.

8. The testimony of both Miller and Shub established that, on April 15, 1987, the Jesse R. Shub Trust (hereinafter "the Trust"), created by Shub for his young son, loaned $100,000 to the Debtor; the Trust was given a 60–day promissory note dated that day for $100,000, at ten (10%) percent interest from the Debtor in exchange therefor; and, later on that same day of April 15, 1987, the Debtor caused a cashier's check in the amount of $100,000 to be issued to the order of Best.

9. Shub further testified that he had authorized the payment of $100,000 from the Trust to Best in order that Best would ship shoes to the Debtor for the Easter season, upon request that he do so by the other officers of the Debtor. However, he stated that similar requests were also made as to other suppliers to the Debtor (he specifically mentioned Cardinal/Wise Shoe Co.) around that time, and he stated that he had not specifically designated that this $100,000 payment was to be made to Best, even though he believed that it would be used for that purpose.

10. Shub also stated that, as was apparently true in most of the Debtor's financial dealings, *see* 84 B.R. at 950–54, that all of the transactions of April 15, 1987, were personally accomplished by Terry Rakoff, the Debtor's President. Rakoff had signing powers with respect to the Trust. The signatures on the check withdrawing "Cash" from the Trust, and executing the note to the Trust, are both those of Rakoff. Best's then-president, Paul Short, testified that Rakoff hand-delivered the $100,000 check to Best on April 15, 1987.

11. The check from the Trust account bears a handwritten Memo "CC—Best Shoe." The cashier's check bears a handwritten notation "from: New York City Shoes, Inc. for 'Mdse O/A.'"

12. Finally, Shub testified that, on June 8, 1987, the Debtor repaid $50,000 of the $100,000 loan made from the Trust to the Debtor in the foregoing transaction. Shub stated that the Trust has filed a proof of claim against the Debtor's estate for the remaining $50,000 balance of the loan. The Debtor has also filed a preference action against Shub, his wife, and the Trust to recover several preferential payments, including the $50,000 repaid by the Debtor to the Trust.

13. Best deposed Rakoff just prior to trial and subpoenaed him as a witness at the trial. Rakoff testified only as to a few, completely non-controversial matters and then, both in his depositions and at trial, refused to answer any questions relating to the specifics of this transaction, invoking his Fifth Amendment right against self-incrimination.[1]

14. Other than Rakoff, Best's only witness was Short, former President of Best Shoe. Short insisted that the entire $100,000 payment of April 15, 1987, was not only from funds "earmarked" to Best by Shub, but, alternatively, was made for fu-

---

1. It is clear to us that responses to any questions relating directly to his specific actions in this or any other matter involving the Debtor would create a "hazard of incrimination" for Rakoff. *See Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Our experience with the affairs of the Debtor and the role of Rakoff therein have firmly convinced us that Rakoff could be subject to criminal prosecution for a wide scope of his activities on behalf of the Debtor. *See* 84 B.R. at 950–54. Rakoff, we believe within his rights, invoked the Fifth Amendment as to every significant question put before him here, as he had in the trial of Adv. No. 87–0698S. *Id.* at 952. *Compare In re J.M.V., Inc.,* 90 B.R. 737, 739, 740–42 (Bankr. E.D.Pa.1988) (witness whose circumstances did not make the court aware of his potential for criminal liability was required to answer a relatively broad range of questions.)

ture shipments and not for any antecedent debts.

15. However, the Answer to the Complaint and correspondence to the Debtor's accountant from Amel Stark, Esquire (a former bankruptcy judge) affirmatively stated, respectively, that the $100,000 payment *was* made for an antecedent debt and that the April 7, 1987, payment *was* on account of the April 16, 1987, shipments, *contrary* to Short's assertions.

16. Short also attempted to support his testimony by production of the original of the account ledger card, a copy of which Miller had relied upon, which did *not* contain the "a" notations. *See* Finding of Fact 7, pages 726–27 *supra.* When confronted with the fact that the copy of the card attached to the proof of claim produced by Miller *did* contain the "a" notations and it was obvious to the court, from personal inspection of the card, that the notations had been erased, Short nevertheless attempted to deny that he could see that an erasure had occurred, and denied as well any role he had in effecting the erasure. The testimony of Short on this point was completely unworthy of belief, and we conclude that he either effected the erasure himself or had someone else do so to attempt to bolster his defense in this proceeding.

17. Short further testified that he was told by Rakoff that the Trust was the direct source of the funds of the April 15, 1987, payment. However, this testimony is contradicted by the notation on the cashier's check, apparently made by an agent of Best, that the payment was "from: New York City Shoes, Inc." Given the low credibility which we attach to Short's efforts at denial that the $100,000 payment was for an antecedent debt, we consider this equally self-serving testimony doubtful as well, and we decline to credit it.

B. CONCLUSIONS OF LAW

1. There is no dispute that this proceeding is core and that we have jurisdiction to finally determine it pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(F).

2. There is also no dispute that the Debtor is entitled to a judgment in the amount of at least $30,000 against Best

and $3,600 against 1st Footwear, apart from any causes of action arising out of the $100,000 payment of April 15, 1987, and that the only potential defenses to the avoidance of the April 15, 1987, transfer as preferential are (1) whether the Debtor had an interest in the $100,000 transferred; and (2) 11 U.S.C. § 547(c)(4), in light of the contention of the Defendants that the shipments of April 16, 1987, were "new value" given for the April 15, 1987, payment.

3. The April 15, 1987, transaction *did* involve a transfer of the Debtor's interest in the $100,000.

As this is the only really close legal question presented in this proceeding, we address this subject hereinafter at some length. The issue presented is the validity of the Defendants' contention that so-called "earmarking" doctrine should be applied here to prevent the Debtor from avoiding the transfer of $100,000 to Best on April 15, 1987. The Defendants contend that the transfer in issue was, in practical effect, made by the Trust to Best and hence did "not issue from the property of the debtor and is not a preference." 3 COLLIER ON BANKRUPTCY, ¶ 547.03, at 547–24 (15th ed. 1989).

We concede that our initial belief that the "earmarking" doctrine is not viable is mistaken. Many courts have applied this doctrine to prevent the avoidance of an otherwise preferential transfer, most notably in *In re Hartley*, 825 F.2d 1067, 1070–72 (6th Cir.1987); *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1355–56 (5th Cir.1986); *Brown v. First Nat'l Bank*, 748 F.2d 490, 491 (8th Cir.1984); *Virginia Nat'l Bank v. Woodson*, 329 F.2d 836, 839–40 (4th Cir.1964); *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70, 72–73 (2nd Cir.1938); *In re Belme*, 79 B.R. 355, 356–58 (Bankr.S.D.Ohio 1987); *In re Castillo*, 39 B.R. 45, 46–47 (Bankr.D.Colo. 1984); and *In re Sun Railings, Inc.*, 5 B.R. 538, 539 (Bankr.S.D.Fla.1980). The doctrine focuses upon the "fundamental inquiry [as to] whether the transfer diminished or depleted the debtor's estate." 3 COLLIER, *supra*, ¶ 547.03, at 547–23. The underlying theory is that, if the transfer is

effected in such a way that the distribution to other creditors is not adversely affected in any way by a transfer, then there is no basis to avoid it as a preference for the benefit of other creditors.

While this reasoning makes sense, it does not appear to us that it is reasoning that ought to be extended beyond a case where the lack of diminution of the Debtor's estate due to the transfer is clear. Certainly, it should not be extended to provide a windfall to a creditor, thus allowing the creditor to sidestep the disgorgement of an otherwise clearly-preferential payment just because the Debtor has utilized a third party as a source of the funds for payment. There is a constant flow of cash in and out of any large retail sales operation like that formerly operated by the Debtor. Borrowing from third parties to make necessary payments to suppliers in cash-flow emergencies would not appear to be uncommon. Insulating a creditor from avoidance of a preferential payment in such a situation simply because the source of the payment to it can be traced to a third party would not be logical, and, therefore, we do not believe that the "earmarking" doctrine exception should be broadly applied.

■ We therefore agree with the observation of the court in *In re Villars*, 35 B.R. 868, 872 (Bankr.S.D.Ohio 1983), that the mere fact that tracing or "earmarking" of funds disbursed by a debtor is possible should not, in itself, exempt a transfer from the category of preferentially avoidable. Rather, such "earmarking" must be accompanied by the element of strict control by the third party over the distribution of the funds which it advances to the debtor. If such control is lacking, the debtor is and would be completely within its rights in retaining the funds received, or using them in whatever other way the debtor wishes. If the debtor, rather than the third party, has the power to determine how the funds can be used, then the debtor's exercising its discretion to disperse the funds, as op-

posed to retaining them, *is* an act which diminishes the assets of the debtor's estate.

It therefore appears to be true, as Collier states, that the most significant and necessary element to consider in application of the "earmarking" doctrine is determining whether payment of the allegedly "earmarked" funds actually diminished the Debtor's estate. However, the creditor seeking to invoke the "earmarking" doctrine must, in our view, establish that the third party, as opposed to the Debtor, controlled the distribution of the funds. Failing this, we believe that the creditor has a most difficult burden in establishing the absence of diminution of the Debtor's estate as a consequence of the transfer.[2]

■ In the context of the actual operation of this Debtor, as established in this record and as we observed in our prior Opinion in Adv. No. 87–0698S in this case, issued after a four-day trial in which we had an ample opportunity to examine all of the Debtor's principals, it is apparent that the financial control of the Debtor was entirely in the hands of Rakoff. In our previous Opinion, we made note of the Debtor's "complete lack of internal controls to uncover Rakoff's activities," 84 B.R. at 953; the "autonomy" accorded to Rakoff to "do what he liked without detection" in the fiscal arena, *id.;* and the particular lack of "business acumen" of Shub. *Id.* at 952.

Here, we found, consistently with the above observations, that Shub delegated control of all of his fiscal affairs to Rakoff. *See* Findings of Fact 9 and 10, page 727 *supra.* Rakoff was a signatory of the Trust of Shub's beloved little son over which we might have expected, of all things, that Shub would retain exclusive control. Shub obviously relied completely upon Rakoff to withdraw funds from the Trust as Rakoff saw fit. Shub may have correctly assumed that the funds here would be paid over to Best. However, we think that Shub was being perfectly can-

---

**2.** There may be certain instances, however, where this could be done. For example, if the debtor has no obligation to repay the third party for the payment made, then the "gift" of the payment to the creditor by the third party would not diminish the debtor's estate.

did [3] when, in response to the pointed cross-examination question as to whether he "knew" that the funds taken from the Trust would be paid to Best, Shub answered that, while he believed that Rakoff would use them for this purpose, they could, as far as he was concerned, just as well have been used by Rakoff to pay other suppliers, such as Cardinal/Wise. We believe that the funds could just as easily have been misappropriated by Rakoff, as some funds apparently were. It is therefore clear to us that Rakoff, as the Debtor's agent, was in complete control of the disposition of these funds. Shub, or the Trust, the third party, had little or no actual control over them.

We therefore attach relatively little significance to the fact that, for a "magic moment," the funds were in the Debtor's account rather than passing directly from Shub to Best. *Compare Coral Petroleum, supra,* 797 F.2d at 1359. Rather, we note that here, in contrast to *Coral Petroleum,* the Debtor had full control over the funds at all times after the third party put them in Rakoff's hands. *Compare id.* at 1360–61. This element was present, certainly to a higher degree than here, in all of the other cases cited at page 728 *supra* where the "earmarking" doctrine was applied as well. *E.g., Hartley, supra,* 825 F.2d at 1068 (third party paid creditor directly); *Brown,* 748 F.2d 490–91 (third parties making payment were co-obligers with the debtor, who themselves received nothing from the debtor for doing so); *Virginia National Bank,* 329 F.2d at 840 (payment to creditor by debtor's sister avoidable except to the extent that consideration was given by the debtor to his sister for the payment); *Grubb,* 94 F.2d at 72–73 (third parties made payments directly to the creditor and/or payments to the creditor were found to be conditions of loans); *Belme, supra,* 79 B.R. at 356 (third party made a loan by way of a joint check to the debtor

and the creditor to assure that it went to the creditor); *Castillo, supra,* 39 B.R. at 46 (third party paid creditor directly); and *Sun Railings, supra,* 5 B.R. at 539 (court found that the third party designated the creditor to be paid with the funds).

More analogous to the instant case are the many authorities cited by the Debtor, where the "earmarking" doctrine was not applied. In particular, we note *Smyth v. Kaufman,* 114 F.2d 40, 42 (2d Cir.1940), in which the court holds that the third party's knowledge that loan proceeds would be used for a particular purpose is irrelevant if the loan is made generally. Thus, where there is an absence of strings attached to the funds, *In re Telephone Stores of America, Inc.,* 54 B.R. 25, 26 (Bankr.D.N.M.1985), or the debtor has the legal right to use the funds for any purpose, *Villars, supra,* 35 B.R. at 872, the "earmarking" doctrine is inapplicable. In cases where the debtor controlled how the funds were to be allocated, the debtor was found to have a sufficient "interest" in the property transferred to satisfy § 547(b). *See, e.g., In re Van Huffel Tube Corp.,* 74 B.R. 579, 585–86 (Bankr.N.D.Ohio 1987); *In re Howdeshell of Ft. Myers,* 55 B.R. 470, 474 (Bankr.M.D.Fla.1985); *In re Schwartz,* 54 B.R. 321, 325 (Bankr.W.D.Wis.1985); and *In re Jaggers,* 48 B.R. 33, 36–37 (Bankr.W.D.Tex.1985).

■ We therefore conclude that there is ample authority for the conclusion that, if the debtor, as here, has control over the use of the funds, including the full discretion to retain the funds if it wished to do so, the payment of funds over to a creditor diminishes the debtor's estate. There is no evidence that the estate was not, for some other reason, diminished by this payment to Best. *See* page 729 n. 2 *supra.* Rather, the estate became obligated to repay the Trust $100,000 as a consequence of this

---

**3.** As in our prior Opinion, 84 B.R. at 953, we find Shub to have been a credible witness, particularly, here, as compared to Short. We do note that Shub's testimony, while helpful to the Debtor, also worked to his own self-interest. The Debtor concedes, as it must, that, if the $100,000 payment is preferential as to Best, then

the Debtor is precluded from a double recovery, and cannot recover the $50,000 which it paid back to the Trust in consideration for part of the $100,000 loan in Adv. No. 88–0972S. However, we had no indication that Shub comprehended and therefore molded his testimony to fit this scenario.

transaction. Therefore, we conclude that the "earmarking" doctrine is inapplicable here and that all the elements of § 547(b) were satisfied as to the $100,000 transfer of April 15, 1987.

4. Both the Debtor and Best agreed, at the time that the $100,000 payment of April 25, 1987, was made, that it was made for and on account of antecedent debt owed by the Debtor to Best. Short's attempt to deny this at trial is specifically discredited by us. The new value given in the form of Best's shipments of additional goods to the Debtor on April 16, 1987, in the amount of $35,163.90, was, except as to the $9.85 difference, prepaid by the Debtor's April 7, 1987, payment in the amount of $35,154.05. Therefore, Best provided new value to the Debtor, within the scope of 11 U.S.C. § 547(c)(4), only to the extent of $9.85. Only such new value as is given in exchange for an otherwise avoidable payment is protected by § 547(c)(4). *See In re American Int'l Airways, Inc.*, 68 B.R. 326, 336–37 (Bankr.E.D.Pa.1986), *aff'd*, C.A. No. 87–1287 (E.D.Pa. April 12, 1987).

5. The Debtor is entitled to recover $99,991.15 of the April 15, 1987, transfer, plus the $30,000 agreed preferential payment, or a total of $129,991.25 from Best.

6. The Debtor is also entitled to recover $3,600 from 1st Footwear, as the ultimate transferee of the initial preferential transfers by the Debtor to Best, pursuant to 11 U.S.C. § 550(a)(2).

7. The Debtor is also entitled to interest from the date of the filing of this proceeding, *i.e.*, December 7, 1988, to the date of this Order, there being no circumstances justifying denial of such interest. *See In re Southern Industrial Banking Corp.*, 88 B.R. 174 (Bankr.E.D.Tenn.1988); and *In re Art Shirt, Ltd.*, 68 B.R. 316, 325 (Bankr.E. D.Pa.1986), *aff'd*, 93 B.R. 333 (E.D.Pa. 1988). In addition, the Debtor is entitled to costs and post-judgment interest pursuant to 28 U.S.C. § 1961.

C. ORDER

AND NOW, this 14th day of April, 1989, judgment is entered in favor of the Debtor and Plaintiff, NEW YORK CITY SHOES, INC., and against (1) Defendant BEST SHOE CORP. in the amount of $129,991.15; and (2) Defendant FIRST FOOTWEAR CORP., in the amount of $3,600, plus, as to both amounts, interest at six (6%) percent per annum from December 7, 1988, to the date of this Order; costs of the suit; and post-judgment interest from the date of this Order to the date of payment, pursuant to 28 U.S.C. § 1961.