John R. BUTZ, Trustee in Bankruptcy, Springfield, Ohio 45502, Plaintiff,

v.

CHAMPAIGN LANDMARK, INC., Urbana, Ohio 43078, Defendant.

In the Matter of Gary Russell BODEY, Brian Paul Bodey, Debtors.

Adv. Nos. 3–83–0336, 3–83–0337. Bankruptcy Nos. 3–82–00231, 3–82–00232.

United States Bankruptcy Court, S.D. Ohio, W.D.

Oct. 13, 1983.

Stephen D. Miles, Dayton, Ohio, for defendant.

John R. Butz, Springfield, Ohio, trustee/plaintiff.

R. Larry Schneider, Marysville, Ohio, for debtors.

### DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### FINDINGS OF FACT

Brian Paul Bodey and Gary Russell Bodey filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code on 4 February 1983.

On 11 April 1983 John R. Butz, Trustee in Bankruptcy, filed a Complaint in the Brian Paul Bodey case against the Defendant, Champaign Landmark, Inc. (hereinafter Landmark) seeking to avoid certain transfers and for money judgment in the amount of $5,817.53 pursuant to 11 U.S.C. § 547. He filed a similar complaint in the Gary Russell Bodey case on 11 May 1983. By Agreed Order entered 29 September 1983 both adversarial proceedings were consolidated for trial.

The matters came on for trial 30 September 1983 upon the pleadings, stipulations of fact contained in pretrial orders entered 2 September 1983, and evidence adduced at the trial on 30 September 1983.

Both Debtors prior to instituting bankruptcy proceedings had farmed together for about 3 years, carrying an account with Defendant in the name of "Bodey Farms." They had maintained two very active accounts, one for feed and miscellaneous supplies and another for fuel oil. The account records are voluminous and consist of numerous pages. Charges had been made on the miscellaneous supplies account for the year 1982 to the date of filing in bankruptcy totalling $65,593.99 and on the fuel oil account in the amount of $7,626.35. The balance due on the miscellaneous account on the date of filing in Bankruptcy was $17,079.93; and the balance 45 days prior to filing was $13,237.87. On the fuel oil account the balance on filing was $207.18, and the balance 45 days prior to filing was in the amount of $4,468.14.

The transfers placed at issue by the pleadings are a check credited to the accounts on 17 January 1983, in the amount of $5,000.00; and "dividends" totalling $817.53 credited on 28 March 1983. From the $5,000.00 payment, $4,691.10 was credited to the miscellaneous account, reducing the balance from $20,110.99 to $15,419.89. The remainder of $308.90 was credited to the fuel oil account, reducing the balance to $207.18. Both of the dividend credits were applied to the miscellaneous supplies account reducing the balance on March 28, from $17,079.93 to $16,262.40.

After the January 17 payment to the accounts, the Debtors made additional purchases totalling $2,581.98 and payments totalling $2,309.03. Within 45 days prior to bankruptcy the total purchases were in the amount of $6,435.64 (47 separate charges); and, 29 separate payments were made to the account, totalling $6,474.06. Even though the understanding between the parties was that payments on the account were due within thirty days after purchase, such regular payments were often delayed because of the nature of the farming business. In fact, payments were made in erratic amounts as farm income was received. The accounting procedure applied by Defendant was to credit payments to the oldest account charges first. Shortly before the January 17 payment, the Defendant contacted the Bodeys because they were "concerned about" the delinquency in making payments to the account. At the time payment was received, the account was "on alert" and "under observation." The $5,000.00 payment was not in an unusually large amount compared to some previous payments to the accounts; and, the only intent of the Debtors in making the payment was to pay as much as possible so that their credit standing could be maintained for doing business as usual. On 3 February 1983 (after bankruptcy) the mother of Gary Bodey paid the amount of $921.94 to the

miscellaneous account in his behalf. The credits totalling $817.53 made to the account by Defendant on 28 March 1983 constituted "dividends" earned on the basis of prior purchases to the account.

There is no question or doubt that both Debtors were in fact insolvent for months prior to the institution of the bankruptcy cases.

## DECISION

The issue as formulated by the parties is whether the facts demonstrate an exception to preferences avoidable by a Trustee, pursuant to 11 U.S.C. § 547(c)(2) as the "payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee ... made not later than 45 days after such debt was incurred." No citations of case precedents or other authorities have been submitted by either party.

The facts demonstrate that all five criteria for a "preferential transfer" under 11 U.S.C. § 547(b) have been established by the facts *instanter* and that the transfers in question may be avoided by the Plaintiff unless one of the six specified exceptions under § 547(c) are applicable, including the one raised by the defendant. Hence, only the facts pertaining to the applicable exceptions need by analyzed.

### I

We first look to the facts as they pertain to the exception found in 11 U.S.C. § 547(c)(2) as raised by the parties. On the facts we are constrained to conclude that this exception does not apply to the $5,000.00 payment made and credited on January 17, 1983. On that date the balance due on the accounts were $20,110.99 and $516.08 respectively, based upon a running account for numerous purchases made during the entire year of 1982 (and previously). Each time a charge was added to the account during the year, a new debt was incurred. In fact, it was the understanding of Landmark with the Debtors that payments would be made within thirty days of the charge. The fact that payments had

been made erratically over the course of dealing and not made regularly each thirty days does not negate the principle that the debt was incurred as purchases were made. The testimony of the Bookkeeper for Landmark verified the accepted principle that payments made on the running account were credited to the delinquent portions of the account first. After the $5,000.00 payment had been credited to the accounts, the balances were still very seriously delinquent. For instance, the account balance on the miscellaneous supplies account still remained at $15,419.89. Referring to the terms of the statute, § 547(c)(2), the transfer on January 17 was "later than 45 days after such debt was incurred." See decision by this Court in *Matter of Williams,* 5 B.R. 706, 6 B.C.D. 930, 2 C.B.C.2d 1216 (Bkrtcy. 1980). See, also, *Bankruptcy Service,* 1A Bkr–L Ed Section 6:219 for a discussion of the historical origin of this statutory exception.

### II

Finding *contra* Landmark as to exception (c)(2), however, does not necessarily preclude the application of other principles and exceptions. Adverting to the facts, we note that the Trustee does not raise any issue as to the 29 other payments within the 45 day period in the total amount of $6,474.06. These payments represent current cash payments for 47 purchases made during the same period. Based upon the testimony of the parties and examination of the account records, it is obvious that the Debtors were put upon a Cash On Delivery basis during this period, because of the serious delinquency in the payment of amounts long due and owing, and which had prompted the Defendant to place the account on "alert" and "under observation." Immediately before the January 17 payment was made, the "Feed Manager" had been instructed to "talk" to Bodey. Based upon the assumption that the Debtors had been placed on a cash basis for all current purchases, it would appear that there could be no preference because the value of the estate otherwise available for distribution to other cred-

itors of the same class was not diminished. Such facts require application of the contemporary exchange exception incorporated in 11 U.S.C. § 547(c)(1) and 547(c)(4) which adopts the "net result rule" as to new credits extended during the preference period and simultaneously paid by the Debtors. As to the charges to the accounts after January 17, the exception for subsequent advances as incorporated in § 547(c)(4) is read in *pari materia* with § 547(c)(2), thereby combining the ordinary course of business rule and the net result rule to the extent that the contemporary exchange rule is not applicable. The U.S. Court of Appeals for the Sixth Circuit appropriately terms the "net result rule" as a "subsequent advance rule," in its opinion in *Fulghum, etc., et al. v. Ranier, et al.,* 706 F.2d 171 (May 9, 1983, pending in the Supreme Court on Petition for Certiorari filed August 6, 1983).

The "subsequent advance rule," however, requires attention to other facts and issues not covered by the pleadings. It is noted that credit was extended for 17 purchases after January 17, in the total amount of $2,581.98. Credits are shown by the account records for payments by Debtors in the amount of $2,309.03, plus a payment from the mother of one Debtor for $921.94, totalling the sum of $3,230.97. Hence, the net result of the $5,000.00 payment on January 17, should be decreased by the amount of $648.99, leaving a total net transfer in the amount of $4,351.01. (For some reason, not clarified by the evidence, the payments made to the account by Debtors between January 17 and January 31, do not result on the account records in reducing the total amount due as shown on the account. The payment of $921.94 credited to the account on February 3, is the only payment shown by the records as reducing the delinquent account balance.) In computing the net result rule consequences, however, the avoidable preference cannot be reduced more than the difference between credit extended and C.O.D. payments made to the account during the same period after January 17.

## III

Also, in a different category from the § 547(c)(2) exception were the setoffs to the accounts for two "dividends," totalling $817.53. Even though these credits to the account were termed "dividends," the evidence indicates that they should be more accurately termed as in the nature of discounts for volume purchases.

The credits to the accounts for the quantity discounts were made on 28 March 1983, after bankruptcy, and cannot be dealt with by the provisions of 11 U.S.C. § 547, which pertains to prefiling preferential transfers. The reason precipitating a setoff of these amounts on 28 March 1983 is not entirely explained by the evidence. It must be assumed, nevertheless, that such a discount must have been earned prior to bankruptcy and computed based upon the total purchases to the account for the entire year, totalling $66,593.99. Under this interpretation, prefiling mutual debts are involved.

Bankruptcy Code 11 U.S.C. § 553 pertaining to "setoffs" removes with limited exceptions the consideration of setoff rights under preference rules. The $817.53 credit to the account, being postpetition, cannot be challenged by the Trustee as a "voidable preference". The pleadings furthermore raise no issues regarding postpetition transfers. A cursory reference to the evidence as adduced, nevertheless, requires a denial of the Trustee's claim to these funds. See *Matter of Springfield Casket Co., Inc.,* 21 B.R. 223, 9 B.C.D. 473, B.L.D. ¶ 68864 (Bkrtcy.1982).

The holder of a right of setoff is invested with the status of a secured creditor in the allowance of claims. 11 U.S.C. § 506(a). The issue now implicit from the facts is the consequence of the violation of the automatic stay provisions of 11 U.S.C. § 362(a)(7), which prevents the exercise of the setoff right without obtaining relief from the stay. As the Plaintiff does not challenge the existence of a right of setoff, and the evidence reveals no prejudice to the rights of the Trustee because of the violation of the postpetition transfer, neither

sanctions nor denial of the claim of the Defendant appears warranted, because the right of setoff to the extent recognized by the Bankruptcy Code in 11 U.S.C. § 553 would not have been contested by the Plaintiff if a request for relief from the stay had been duly prosecuted by Defendant. At this late date in the administration of the cases, the evidence specifically indicates reason for applying the *de minimis non curat lex* maxim. The Trustee may avoid only postpetition transactions not authorized by the court or the statutes. 11 U.S.C. § 548(a)(2)(B). Inasmuch as the § 362(a)(7) automatic stay does not invalidate the substantive right of setoff, relief therefrom granted by the Court would constitute authorization to assert the secured creditor status.

In conclusion, the court finds that the Defendant received a voidable preference to the extent of $3,533.48 from the transfer in the amount of $5,000.00 made on January 17, 1983; but, that the total amount of other funds paid by the Debtors within 45 days before the filing of the bankruptcy petitions in the amount of $6,474.00 and the amounts received or credited to the accounts by Defendant after the January 17 transfer and after the filing of the bankruptcy petitions, in the total amount of $4,048.50, do not constitute voidable preferences.