**In the Matter of Dwight E. VILLARS, Lorna C. Villars, Debtors.**

**Bankruptcy No. 3–82–00087.
Adv. Proc. 3–82–0783.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

Dec. 9, 1983.

---

Herbert Ernst, Jr., Trustee, Dayton, Ohio.

William B. McCracken, Wilmington, Ohio, for debtors.

Harold Jarnicki, Lebanon, Ohio, for defendant.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### PRELIMINARY PROCEDURE

This matter came on for trial on 7 September 1983 and was submitted on the pleadings: the evidence as adduced and as stipulated or submitted into evidence in the pretrial order entered 6 May 1983; and the post trial briefs, as submitted in behalf of Plaintiff on 23 September 1983 and in behalf of Defendant on 21 October 1983. Plaintiff also submitted a trial brief on August 2, 1983.

### FINDINGS OF FACT

Dwight E. Villars and Lorna C. Villars (Debtors) filed their petition for relief pursuant to Chapter 7 of the Bankruptcy Code in this Court on January 14, 1982.

Debtors had engaged in the farming business prior to filing and had purchased feed, fertilizer and other supplies over a period of about ten years from Defendant, Settlemyre Seed Company, a corporation. Typically, such supplies were purchased primarily in the Spring and early Summer of each year and the account settled each year after the Fall harvest, according to Mr. William Settlemyre who testified as officer of the corporation.

Two letters of correspondence from Lebanon Production Credit Association (LPCA) to the Trustee and to the attorney for Defendant, which were introduced into evidence by Defendant conformably to the pretrial order, expressed the understanding of LPCA as to disbursement of its operating expense loans, the gist of which in pertinent part, is as follows:

"Lebanon Production Credit Association does not have a strict rule that all disbursements from an operating loan account be made jointly payable to the member and the creditor. Not all drafts issued from the operating account with Villars were made jointly payable to him and creditors. However, drafts of a large amount were made jointly payable to Villars and creditors. Twenty-One Thousand One Hundred Sixty-Two and 12/100 Dollars ($21,162.12) is certainly a large draft amount and Lebanon Production Credit Association is necessarily more cautious with such a large amount and concerned that it will in fact be paid to the source (in this case, Settlemyre Seed Company) that is due and owed the money. Lebanon Production Credit Association was aware that Settlemyre Seed Company was owed the amount of the draft for fertilizer, chemicals and seed provided to Villars and the joint check method assures proper payment. The fund was created for payment of operating expenses, and as is customary in the farming business, the draft was is-

sued in the accepted, ordinary and expected business method."

However, the account record for the Debtors with Defendant is not entirely consistent with the testimony as to settlement being made at the end of each crop year. The account record demonstrates that there had not been a settlement at the end of the 1980 crop year. In fact, a balance totaling $5831.67 with carrying charges was carried over from 1980 to the first purchases in March, 1981. This amount was carried on the corporation books and not paid until the payment of the account in full on 23 November 1981.

Debtors had for many years established a "line of credit" with LPCA for the financing of the operating expenses of the farming business during the growing season, secured by an open-end junior mortgage lien on their real estate and security interests in farm chattels and crops. The most recent promissory note held by LPCA was dated 30 January 1981 in the face amount of $280,000.00. According to Plaintiff's Exhibit 2, the loan principal balance was in the total amount of $254,093.31 on December 31, 1981, including accrued interest.

Mr. William Settlemyre, in behalf of the Defendant corporation, testified that his firm had done business also with LPCA over the years. The corporation had been formed in 1966. He and his wife both contacted LPCA in "late October or early November" about the Debtors' account and induced the issuance of a check for payment of the outstanding account in full. The check (Draft No. 34962) dated November 19, 1981, was made payable to "Dwight E. Villars and Settlemyre Seed Co." in the amount of $21,162.12. Villars endorsed the check and the funds were deposited in the bank account of Settlemyre Seed Co. on November 23, 1981. The account record, marked for identification as Plaintiff's Exhibit 3, was identified by Mr. Settlemyre as the debt for which the check constituted payment in full.

Mr. Settlemyre did not testify as to why he and his wife had called LPCA to seek the payment at this particular time in the history of the account, although he disclaimed any knowledge of the Debtors' dire financial troubles. He had no competent knowledge at the time as to the actual net valuation of Debtors' assets; nor did he have any knowledge of the extent of their indebtedness. He learned in late November that LPCA had "forced" Debtors to sell their farm and other assets at public auction. In connection with this liquidation, the Settlemyres and the Settlemyre Seed Company purchased wheat from Mr. Villars on 20 November 1981 for $2169.35; corn, on 21 December 1981 for $2283.93; and hogs, on 4 January 1982 for $29774.18. The checks in payment for all of these purchases were drawn to "Production Credit Assoc." because the Settlemyres knew that Villars had placed a "crop lien" on all assets, including the farm real estate.

Proofs of claim filed in the bankruptcy case total in excess of $613,000.00. The claims filed by secured creditors which are cross collateralized total in excess of $416,000.00. After the liquidation of Debtors' assets as forced by LPCA (commenced at practically the same time as the transfer of the $21,162.12 in funds to Defendant) and in which Settlemyre participated in purchasing livestock and other farm products during late November and December, 1981, by payments to LPCA, the claim of LPCA as filed in the bankruptcy case was only reduced to an amount in excess of $195,000.00. The contents of the schedules and statement of affairs have not been judicially noticed, and have not been offered in evidence. Proofs of claims of record in the case file have been considered as *prima facie* evidence.

## DECISION

A motion was made at bar for judgment to Defendant at the close of Plaintiff's case on the basis that Plaintiff/Trustee had failed to establish that the debt was an antecedent debt, upon which decision was reserved. Counsel for Defendant also argues that the monies transferred were not Debtors' property and that, "Even though the goods were provided to the debtor in

the spring of 1981, no payment was due to creditor, Settlemyre Seed Company, until harvest time in the fall of 1981." Hence, it is urged that, "The payment was not made later than forty-five days after the debt was incurred."

All of the elements of an avoidable preference are not at issue, and need not be pedantically labored on the evidence. There is no dispute over the fact that there was a transfer from Debtors to Defendant on or about 23 November 1981 by payment of the check in the amount of $21,162.12 within 22 days before the petition in bankruptcy; and that Defendant benefited by receiving thereby more than it would from the liquidation proceedings of the Bankruptcy Code.

## I

■ Apparently, the issue raised by the motion at bar as to whether the payment of the account was in payment of an "antecedent debt" is raised in behalf of Defendant as a procedural error by Plaintiff in presenting the evidence because this issue was not raised at the pretrial conference, or in the pretrial order as approved and endorsed by the attorneys for both parties on May 6, 1983.

The argument in the brief submitted in behalf of Defendant reads, in pertinent part, as follows:

"All of the above cases discuss what is an antecedent debt. However, in the case before this Court, the only evidence presented by the plaintiff in his direct portion of the case was the presentation of the check itself with no explanation or documentation as to when the debt was actually incurred. We submit that failure to present any evidence in this regard should result in the plaintiff having failed to meet his burden of proof. The case should be dismissed and judgment rendered in favor of the defendant upon defendant's motion at the close of plaintiff's case."

As dispositive of the real issues, such argument is only specious at best. Both the check at issue and the account record were identified in open court during the examination by the Trustee of William Settlemyre before resting his case. He unequivocably testified that the check had been received in payment of the account, and the account record carries the history of purchases not only for 1981, but for several years preceding. The Trustee apparently was addressing the evidence as it pertained to the issues as they stemmed from the pretrial conferences and pretrial order.

Hence the officer of Defendant by testimony specifically admitted and acknowledged these facts. Furthermore, the account record (Plaintiff's Exhibit 3) was admitted into evidence without objection when the matter was finally submitted to the court and counsel for Defendant specifically concurred in its admissibility.

The motion to dismiss made at bar and the above argument incorporated in Defendant's brief, therefore, do not merit serious discussion. The Trustee having established the payment in question, to be applied to the identified account, cannot be faulted for relying on the statutory presumption of insolvency for such a transfer just three weeks before the filing of the bankruptcy petition. The other issues as raised in behalf of Defendant deserve more extensive analysis. As elements of single issues have been fragmented into separate issues by the brief of Defendant, the framework of the analysis following will revert back essentially to the terms of the pretrial order.

## II

■ The first crucial issue raised by the Defendant is that the $21,162.12 check drawn by LPCA was not "property of the estate", as follows:

"A transfer of money or property by a third person to a creditor of a debtor, that does not issue from the property of the debtor, is not a preference. Further, in cases when a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the

debtor's assets, and therefore no preference is created. Continuing, the rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or *are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly "earmarked".* [Emphasis in original].

As authority, both parties cite for opposite arguments 4 *Collier on Bankruptcy,* 15th Ed. § 547.25. Both parties also cite *Grubb v. General Contract Purchase Corp.,* 94 F.2d 70 (1938, CA2 NY). Defendant also cites *In Re Rector,* 14 B.R. 1008, 1010 (Bkrtcy.E.D.Tenn., 1981) and *In Re Riddervold,* 647 F.2d 342, 346 (CA2, 1981). Both parties and *Collier* place undue emphasis on semantics as to whether the proceeds of the Debtors' operating loan were "earmarked", in the present factual context.

The placing of Defendant's name on the check as drawn and whether the funds thereby were "earmarked" is not dispositive of the issue. Such is not the thrust of the cited authorities and the use of the term as a dispositive rule would be an exaggeration. The thrust of the case precedent of the *Grubb* case has been more properly codified by the terms of 11 U.S.C. § 547(c)(3) as to enabling loans in connection with the acquisition of property by a debtor after the loan has been made. See H.Rept. No. 95–595, P. 373, Bkr–L Ed, Legislative History § 82:17. In the facts *sub judice* no enabling loan was involved. The operating loan to the Debtors had been made back in the Spring of 1981. Defendant was neither a party to the loan nor in privity of contract. As soon as the check was drawn payable to the order of Villars it became property to him. Whether or not there was some nature of "earmarking" begs the question. If the Debtor did not choose to increase his secured loan, to pay the Defendant, he had the absolute control over these funds in the sense that the Defendant had no legal right to force him to make an endorsement. The distinction is apparent between such control over his property and the situation where the funds are held in irrevocable trust or in

*custodia legis,* such as in the decision of this court in *Ledford v. Associates Financial Services* (Bkrtcy.S.D.Ohio 1980), 5 B.R. 676, 6 B.C.D. 1069.

The focus should be on whether or not by the transfer the value of the estate had been diminished and the preferential effect to the Defendant as a creditor.

The endorsement of the check by the Debtor effected an additional draw on his operating loan for which he became liable to LPCA, a secured creditor. His endorsement enabling the Defendant to deposit the funds effected payment in full of an unsecured debt, and thereby the obtainment of a recovery in excess of the recovery of other creditors of the same class (unsecured). The secured portion of the outstanding debts was thereby increased by the $21,-162.12 transfer, which precluded payments to other unsecured creditors from the Debtors' property held as collateral by LPCA to that extent. As to the unsecured creditors, therefore, there can be no doubt that the estate was depleted in paying Defendant. Authority for this obvious conclusion can be found in this circuit in *Steel Structures, Inc. v. Star Mfg. Co.,* 466 F.2d 207 (CA6, 1972). See, also, *Emery v. Union Inv. Co.,* 212 F.2d 183 (CA6, 1954), and the review of similar authorities in different contexts in 9A *American Jurisprudence* 2d § 549. Semantically, therefore, the transfer should more accurately be designated as "an earmarked voidable preference."

### III

■ The next issue pertains to the insolvency of the Debtors and the burden of proof as imposed upon the trustee to establish this element of an avoidable preference. This is a factual question and the court is constrained to conclude that insolvency has been established by the Trustee by preponderating evidence, including the presumption of insolvency incorporated into 11 U.S.C. § 547(f).

In fact, no evidence whatever of solvency was introduced by Defendant. Mr. Settlemyre testified that he had no reason to

believe the Debtors were insolvent and that he continued to deal with them by the purchases of various chattels during a liquidation of all of the farm assets precipitated by the secured creditor. Knowledge of insolvency is not relevant to the test and definition of insolvency in Code § 101(26). As to probative effect, the knowledge and participation by Mr. Settlemyre in the forced liquidation of Debtors' farm assets between November 20, 1981 and January 4, 1982, substantiates the existence of "balance book" insolvency inasmuch as the filing in bankruptcy on January 14, 1982, was immediately thereafter. Furthermore, the evidence demonstrates that the Settlemyre account went delinquent in the 1980 calendar and crop year.

Proofs of claims filed in the case under oath have already totaled in excess of $613,-000.00. The Trustee's reports of the net proceeds realized from the sale of unencumbered assets shows total funds in the amount of only $42,120.95.

The crucial fact in support of the Trustee's burden of proof, nevertheless, is the presumption of insolvency during the ninety days immediately prior to the filing of the bankruptcy petition. 11 U.S.C. § 547(f). This presumption must be applied pursuant to Rule 301 of the Federal Rules of Evidence. It does not shift the ultimate burden of proof on the question of insolvency, but it does require the Defendant to come forward with "some evidence" to rebut the presumption. HR Rept. No. 95–595, 95th Cong. p. 375, Bkr–L Ed. Legislative History § 82:11. No competent evidence whatever was submitted by Defendant as to the valuation of the Debtors' assets or as to the amount of creditors' claims. Rule 301 shifts the burden of producing evidence, not the burden of persuasion. The Defendant in producing no competent evidence as to solvency does not even meet the minimum test of the "bursting bubble" theory, which the legislative history negates.

Logic at least dictates that the presumption of insolvency must be factored into the time frame in a case such as this since the challenged transfer occurred on the very eve of a forced liquidation of a debtor's assets and the filing of a bankruptcy petition within three weeks after the transfer. The quantum of proof necessary to rebut such a presumption bears an inverse ratio and function to the nearness of bankruptcy within the 90-day period prescribed by 11 U.S.C. § 547(f). The shorter the time lapse, the greater the proof required to rebut the presumption. Obviously, both the Debtors and the LPCA (as lender) could have been called upon as a minimum input to testify if evidence of solvency had been sought to rebut the presumption.

Weighing the evidence under any interpretation leads to the obvious conclusion that no evidence could conceivably be available to Defendant to rebut the presumption that the Debtors' assets by any method of valuation exceeded outstanding debts. There have been filed proofs of claims by secured creditors for claims with multiple liens in excess of $416,000.00. The process of liquidation was commenced at practically the same time as the transfer of the $21,-162.12 in funds to Defendant on November 23, 1981. In fact the claim of Lebanon Production Credit Association, which is only a junior lien holder, totals in excess of $195,000.00 after liquidation of Debtors' live-stock, crops and other farm products in which Settlemyre participated during late November and December, 1981.

## IV

The Defendant further argues that the transfer was made not later than forty-five days after the debt was incurred, adverting to the testimony of Mr. Settlemyre that farmers customarily cannot pay all crop growing expenses until after the Fall harvest. Despite the fact that the account record demonstrates that a large portion of the account debt was carried over from the previous 1980 calendar and crop year, the argument is made by Defendant that,

"In the case before this Court, no monies were due, and no amount was assessed until such time as the payment was made, which was in the fall, 1981. It is also

important to consider that the debtor was not obligated to repay Lebanon Production Credit Association until such time as the actual amount assessed and paid to Settlemyre Seed Company was determined. This would have been when the check was paid in November, 1981. It is our position that the payment was not made more than forty-five days after the obligation actually accrued."

The exception to the avoidability of a preference as contained in 11 U.S.C. § 547(c)(2) * has been frequently misinterpreted, as argued by Defendant herein, in connection with farm debts. Assuming, *arguendo,* that the account record does not conflict with the testimony, this court has uniformly applied the terms "ordinary course of business or financial affairs of the debtor and the transferee" in § 547(c)(2)(C) to be controlled and limited by the date the debt is "incurred" as specified in § 547(c)(2)(B). See *Butz, Trustee v. Champaign Landmark, Inc.,* 33 B.R. 926 (Bkrtcy.S.D.Ohio 1983).

The forty-five day period, therefore, was from the date the debtor became legally bound on the debt if it is a charge on an open account. This court, therefore, concurs with the analysis of Levin, *An Introduction to the Trustee's Avoiding Powers,* 53 Am.Bankr.L.J. 173 (1979) and 4 *Collier on Bankruptcy,* 15th Edition § 547.38, which summarizes, "[t]he probably better view is that the debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt." For an application of this principle to consumer debts, see *Barash v. Public Finance Corporation,* 658 F.2d 504, 7 B.C.D. 1438, 4 C.B.C.2d 1548 (7th Cir., 1981). Certainly, this exception was never intended to apply to any debts other than short term debts. As *Levin, op. cit.,* points out, this

conclusion is based upon the fact that Congress selected the 45-day period as a normal trade credit cycle in which payment is made within 30 days from the date goods are shipped or services are performed. Even though the legislative policy of the preference provisions is to facilitate the equality of distribution among creditors by requiring a creditor who has obtained a greater payment than others of the same class to surrender what has been received so that the others may share equally, the exceptions incorporated into 11 U.S.C. § 547(c) were inserted to avoid disruption of "normal financial relations" by the enactment of the presumption of insolvency within 90 days of bankruptcy. See H.Rept. No. 95–595, p. 373, Bkr-L Ed, Legislative History § 82:17.

## V

The court finds that the Defendant has not introduced sufficient evidence to rebut the statutory presumption of insolvency. The court further finds that even if the presumption of insolvency had been rebutted, the trustee has sustained his ultimate burden of proving the insolvency and all of the essential obligations of his complaint and judgment should be entered against the Defendant.

IT IS SO ORDERED.

## JUDGMENT ENTRY ON COMPLAINT FOR MONEY JUDGMENT

In accordance with the Decision and Order entered this date, it is

ORDERED that Defendant pay to the Trustee $21,162.12, the amount of preferential transfer, together with postjudgment interest conformably to Section 302 of the Federal Court Improvement Act of 1982, Pub.L. 97–164, 96 Stat. 55.

IT IS SO ORDERED.

---

* (c) The trustee may not avoid under this section a transfer—...
  (2) to the extent that such transfer was—
    (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
    (B) made not later than 45 days after such debt was incurred;
    (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
    (D) made according to ordinary business terms—.