**In re TRINITY PLASTICS, INC., Debtor.**

**John Paul RIESER, Trustee in Bankruptcy, Plaintiff,**

**v.**

**BRUCK PLASTICS COMPANY, Defendant.**

**Bankruptcy No. 3–90–01827. Adv. No. 3–90–0209.**

United States Bankruptcy Court, S.D. Ohio, W.D.

March 5, 1992.

See also 129 B.R. 141.

**204**

John Paul Rieser, Dayton, Ohio, trustee.

Thomas R. Noland, Robert B. Berner, Dayton, Ohio, for defendant.

## DECISION AND ORDER GRANTING SUMMARY JUDGMENT IN PART TO DEFENDANT AND IN PART TO PLAINTIFF

WILLIAM A. CLARK, Bankruptcy Judge.

This matter is before the court upon cross-motions for summary judgment. The court has jurisdiction pursuant to 28 U.S.C. § 1334 and the standing order of reference entered in this district. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(F)—proceedings to determine, avoid or recover preferences.

### UNDISPUTED FACTS

Prior to its bankruptcy proceedings, the debtor, Trinity Plastics, Inc., was a manufacturer engaged in the business of injection molding. The defendant, Bruck Plastics, was a supplier of the plastic raw material used by Trinity in its manufacturing operations. Two of Trinity's customers were Stanley (USA) and Stanley (Canada), for whom Trinity manufactured various parts for their garage door openers.

At least by the fall of 1989, Bruck was concerned about Trinity's past due balances for the purchase of raw materials, and Stanley wanted assurance that parts it was receiving from Trinity would be delivered in a timely fashion. As a result, Stanley (USA) sent a purchase order to Bruck which read, in part, as follows:

> This P.O. is to secure the backing of Trinity Plastics to purchase 40,000 #'s of Makrolon 2605–1510.... This purchase order is good thru December 31, 1989. All billing and shipping will be to Trinity Plastics Co.

Bruck continued to supply raw material to Trinity in accordance with the purchase order. Subsequently, because of Trinity's past due payments to Bruck, the following

two checks (dated February 14, 1990) were issued jointly to Trinity and Bruck:

1) a check issued by Stanley (USA) in the amount of $31,672.28, and

2) a check issued by Stanley (Canada) in the amount of $6,776.19.

In the case of both checks, David Dilley, who was President of Trinity, went to the offices of Stanley in Covington, and endorsed the checks prior to their transmittal to Bruck. According to Mr. Dilley he "didn't have the check and [he] didn't have the money, so [he] couldn't control it either way" (Deposition of David Dilley, Doc. # 24 at 26).

On April 29, 1990, an involuntary case was commenced against Trinity under chapter 7 of the Bankruptcy Code.

The trustee in bankruptcy has filed a complaint alleging that both of the above payments to Bruck constituted preferential transfers pursuant to § 547(b) of the Bankruptcy Code. Both parties have moved for summary judgment.

### CONCLUSIONS OF LAW

Section 547(b) of the Bankruptcy Code provides:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;

> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Both parties maintain that the controlling determination to be made in this adversary proceeding is whether the funds transferred to Bruck were "an interest of the debtor in property" within the meaning of section 547(b). Specifically at issue is whether the so-called "earmarking" doctrine is applicable. A typical expression of the "earmarking" doctrine is found in *Mandross v. Peoples Banking Co.* (*In re Hartley*), 825 F.2d 1067, 1069 (6th Cir.1987):

> [F]unds loaned to a debtor that are "earmarked" for a particular creditor do not belong to the debtor because he does not control them.

■ The fundamental inquiry, however, is whether the transfer has diminished or depleted the debtor's estate to the detriment of other creditors. *New York City Shoes, Inc. v. Best Shoe Corp.* (*In re New York City Shoes, Inc.*), 106 B.R. 58, 60 (E.D.Pa.1989). To determine whether the estate has been diminished, courts frequently examine the debtor's "control" over property.

In the context of transfers by third parties, the diminution of estate doctrine asks whether the debtor controlled the property to the extent that he owned it and thus the transfer diminished his estate. "Where there is a question as to the debtor's ownership of the money, 'the court must determine whether the debtor had such an interest in the funds that a transfer thereof would result in a diminution of the estate.'" *In re Hartley, supra*, 825 F.2d at 1070 (citations omitted).

### STANLEY (USA)

Clearly, Stanley (USA)—as the guarantor of the debtor's obligation to Bruck for the purchase of raw material by the debtor—could have made a direct payment to Bruck, and the transfer would not have been voidable as a preferential transfer.

There is no preference to the holder of a guaranty when paid by the guarantor, notwithstanding the bankruptcy of the obligor whose performance was guaranteed. (citations omitted) This is so because no preference occurs when the payment *depletes* the *assets of the guarantor* and not those of the debtor. *In re M.J. Sales & Distributing Co., Inc.,* 25 B.R. 608, 614 (Bankr.S.D.N.Y.1982) (emphasis supplied).

*Accord, Shaw Industries, Inc. v. Gill (In re Flooring Concepts, Inc.),* 37 B.R. 957, 961 (Bankr. 9th Cir.1984); *Boyer v. Baker & Schultz, Inc., (In re Smith),* 123 B.R. 605, 610 (N.D.Ind.1991); *Boldt v. Alpha Beta Co. (In re Price Chopper Supermarkets, Inc.),* 40 B.R. 816, 819 (Bankr.S.D.Cal. 1984). Had Stanley (USA) made such a direct payment, the funds would not have belonged to the debtor and would have been in satisfaction of the independent obligation of Stanley (USA) to pay Bruck.[1]

The question, here, is whether Stanley (USA), by issuing a joint check payable to Bruck and the debtor, and by requiring the debtor's endorsement of the check before remitting it to Bruck, moved outside of the protective umbrella of the "earmarking" doctrine, or otherwise tainted the transaction, so as to support a finding of a preferential transfer. In· *Matter of Villars,* 35 B.R. 868, 872 (Bankr.S.D.Ohio 1983), in which a joint check was also issued, the court found that:

> As soon as the check was drawn payable to the order of [the debtor] it became property to him. Whether or not there was some nature of "earmarking" begs the question.... [The debtor] had the absolute control over these funds in the sense that the defendant had no legal right to force him to make an endorsement.

It is difficult to gainsay the court's observations in *Villars.* How can it be legally correct to conclude that debtor has "no interest" in a check made out to himself and to another? What needs to be appreciated and acknowledged is that application of the "earmarking" doctrine is basically the employment of equity rather than a precise legal determination of whether a debtor has an "interest" in property. By emphasizing a debtor's "control" of funds, courts reach a legal conclusion with respect to whether funds are property of the debtor, and are thereby enabled to determine whether one of the elements of § 547(b) has been mechanically satisfied. But the underlying rationale for the "earmarking" doctrine is not simply whether the debtor had some type of control of the funds:

> [T]he courts have been willing to *overlook* the fact that the method chosen by the guarantor to pay off the old creditor was one in which the debtor was given *some control* of the new funds. The courts have said even when the guarantor's new funds are placed in the debtor's possession before payment to the old creditor, they are not within the debtor's "control." *In re Bohlen Enterprises, supra,* 859 F.2d at 565 (emphasis supplied).

■ Thus, *some* control of funds by the debtor is not fatal to the "earmarking" doctrine. The essential prerequisite to invoking the "earmarking" doctrine is that the transfer does not result in a diminution of the debtor's estate:

> [T]he most significant and necessary element to consider in application of the "earmarking" doctrine is determining whether payment of the allegedly "earmarked" funds actually diminished the debtor's estate. *New York City Shoes, Inc. v. Best Shoe Corp. (In re New York City Shoes, Inc.),* 98 B.R. 725, 729

1. Such a scenario was, in fact, the apparent wellspring of the "earmarking" doctrine:

   The earliest enunciation of the doctrine occurred in cases where the new creditor providing new funds to pay off the old creditor, was himself also obligated to pay that prior debt. In other words, the new creditor was a guarantor of the debtor's obligation, such as a surety, a subsequent endorser or a straight contractual guarantor. Where such a guarantor paid the debtor's obligation directly to the old creditor, the courts rejected the claim that such payment was a voidable preference. *McCuskey v. The National Bank of Waterloo (In re Bohlen Enterprises, Ltd.),* 859 F.2d 561, 565 (8th Cir.1988).

(Bankr.E.D.Pa.1989), *aff'd*, 106 B.R. 58 (E.D.Pa.1989).

■ Stanley's use of a joint check, instead of a check issued directly to Bruck (and keeping in mind that the payment to Bruck occurred prior to the debtor's bankruptcy), supports the inference that Stanley (USA) structured the transaction in order to claim that Stanley (USA)—as a customer of the debtor—had satisfied any obligation it owed to the debtor in the amount of $31,672, and that it also satisfied its independent obligation to Bruck. The fundamental question, then, is whether this transfer decreased the debtor's assets. Had Stanley (USA) paid Bruck directly, it would have acquired a right to reimbursement or contribution from the debtor in the amount of $ 31,672. If the debtor (or the trustee in bankruptcy) subsequently filed an action to collect on any claim owed by Stanley (USA) to the debtor in the form of an account receivable, the debtor's claim would have been subject to a setoff of $31,672 by Stanley (USA):

> Under the common law—which survives § 553(a) unless expressly abrogated—a surety or guarantor of a debt can set off against a debt owed to the debtor a claim for reimbursement for a payment made by the surety or guarantor to another creditor of the debtor. (citations omitted) The surety acquires the claim by reason of a direct obligation and thus has a right to setoff. *See Bel Marin Driwall, Inc. v. Grover*, 470 F.2d 932, 936 (9th Cir.1972). Mutuality exists, as required by § 553(a) because the surety's claim for reimbursement and the debtor's debt are owing between the same parties. *Sherman v. First City Bank of Dallas*, 99 B.R. 333, 336 (N.D.Tex.1989), *aff'd* 893 F.2d 720 (5th Cir.1990).[2]

In short, had Stanley (USA) paid Bruck directly, the debtor would have owed a liability to Stanley (USA) of $31,672. The effect of Stanley (USA) using a joint check payable to the debtor and Bruck was to adjust the financial relationship of the debtor and Stanley (USA); functionally there was a setoff prior to bankruptcy between the debtor and Stanley (USA) in the amount of $31,672, and at the same time a payment of the guarantor obligation of Stanley (USA) to Bruck. In the end, the debtor's accounts receivable for Stanley (USA) were reduced by $31,672, but at the same time its liability to Stanley (USA) was reduced by $31,672.[3] Thus, there was no diminution of the debtor's estate. Had Stanley (USA) paid Bruck directly, the debtor could not have collected $31,672 on its account receivable for Stanley (USA), because of the setoff available to Stanley (USA).

In conclusion, although the debtor had some degree of control over the funds represented by the joint check (in the sense that endorsement could have been refused), the form of the transaction did not result in any diminution of the estate compared to a direct payment by Stanley (USA) to Bruck. Finally, this result comports with traditional equitable considerations that a guarantor should not be required to pay an obligation twice. If this transfer were avoided as a preferential transfer, Bruck could well argue that Stanley (USA) was still required to pay under the guaranteed purchase order.

### STANLEY (CANADA)

■ Although the "earmarking" doctrine has been applied where guarantors have paid a debtor's creditor, and where a third party has loaned money to the debtor to pay a specific creditor, courts have not

---

**2.** If for some reason, the element of mutuality is not present in this case, Stanley (USA) would be eligible to assert the common law defense of recoupment, which would allow Stanley (USA) to reduce any amounts it owed the debtor by any amounts the debtor owed Stanley (USA) to the extent the owed amounts arose out of the same guaranteed purchase order.

**3.** Stanley (USA) could not, of course, set off its claim for paying Bruck against its accounts receivable with the debtor until it had actually paid Bruck. Although the setoff technically occurred prior to the actual receipt of the check by Bruck, because the two transactions were effected by a single check, the court views the setoff and payment to Bruck as occurring simultaneously.

extended the doctrine to situations such as that presented by the Stanley (Canada) check. Stanley (Canada) was a creditor of the debtor, but—unlike Stanley (USA)—Stanley (Canada) was not a guarantor of the debtor's debt to Bruck. While it is true that Stanley (Canada) could have made a direct payment to Bruck, such a payment would have constituted a gratuitous transfer, and the court will not assume that transfers in a business setting are intended to be gifts. Further militating against any type of gratuitous transfer is the fact that Stanley (Canada) required the debtor's endorsement prior to the check's remittance to Bruck; as discussed above, the reasonable inference is that Stanley (Canada) requested the debtor's endorsement in order to claim that the debtor had been paid by Stanley (Canada).

The significant difference between the joint check issued by Stanley (USA) and that of Stanley (Canada) is that the former resulted in no net depletion of the debtor's assets whereas the latter did. Had Stanley (Canada) paid Bruck directly, it would *not* have acquired a right to contribution or reimbursement from the debtor because it would not have been paying in accordance with a guarantor agreement. The debtor would still have been able to collect on its account receivable from Stanley (Canada). If the joint check is viewed as satisfying the obligation of Stanley (Canada) to the debtor, it is clear that the debtor's assets in the form of accounts receivable have been reduced by $6,776. Unlike the check issued by Stanley (USA), the Stanley (Canada) check would not have reduced the liabilities of the debtor because the debtor did not owe anything to Stanley (Canada).

Aside from the very important fact that the transaction diminished the debtor's assets, to permit Bruck to retain the funds from this check would be inequitable because of the windfall that Bruck would receive. Based on the guaranteed purchase order, Bruck did not enter the arrangement with any legitimate expectations of being paid directly by Stanley (Canada).

The court is well aware that the "control" exercised by the debtor over the two checks in this proceeding is identical, yet one check was found to constitute a preferential transfer and the other was not. While, at first blush, such a result may appear inconsistent, it merely serves to illustrate and highlight the fact that "earmarking" cases cannot always be satisfactorily decided by resolving the question of "control." As this court has previously observed, mechanical rules regarding the earmarking doctrine and the issuance of joint checks would ignore the impact of the transfer upon the debtor's estate and exalt the form of the transaction over its substance. *Ledford v. First National Bank (In re Belme)*, 79 B.R. 355, 357 (1987). Instead, the court has avoided a formalistic application of the earmarking doctrine, analyzed the underlying circumstances, and focused on whether or not the transfers diminished the value of the debtor's estate.

## ORDINARY COURSE OF BUSINESS EXCEPTION

Bruck also contends that the check from Stanley (Canada) falls within the "ordinary course of business exception" to preferential transfers. Section 547(c)(2) provides that a trustee in bankruptcy may not avoid a transfer under § 547(b)—

(1) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

Section 547(c)(2) is intended to protect recurring, customary credit transactions, incurred and paid in the ordinary course of business of the debtor and the transferee, and to leave normal financial relations undisturbed because they do not detract from the preference section's general policy of discouraging unusual action by either the debtor or creditors during the debtor's slide

into bankruptcy. *Waldschmidt v. Ranier* (*In re Fulghum Construction Corp.*), 872 F.2d 739, 743 (6th Cir.1989).

Because "the provision is written in the conjunctive, a creditor attempting to satisfy § 547(c)(2) must prove all three elements of that subsection." *Logan v. Basic Distribution Corp.* (*In re Fred Hawes Organization, Inc.*), 957 F.2d 239, 243 (6th Cir. 1992). The Sixth Circuit has made it clear that the distinction between § 547(c)(2)(B) and (C) may not be ignored, and "that fulfillment of each subsection is necessary in order to receive the benefit of the exception." *Id.* Subsections (B) and (C) of § 547(c)(2) comprise a subjective and an objective component:

> The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between *that* creditor and *that* debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry. *Id.* at 244.

■ In determining under the subjective test whether the check from Stanley (Canada) was made in the "ordinary course of business," there is no precise legal test which can be applied; instead the courts engage in a fact-specific analysis. *In re Fulghum, supra*, 872 F.2d at 743; *In re Fred Hawes, supra*, at 244. "In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." *Yurika Foods Corp. v. United Parcel Service* (*In re Yurika Foods Corp.*), 888 F.2d 42, 45 (6th Cir.1989). Late payment of a debt is particularly important in determining whether a payment is "ordinary," and will be considered "ordinary" only upon a showing that late payments were the normal course of business between the parties. *In re Fred Hawes, supra*, 957 F.2d at 244.

■ An itemization of transactions between the debtor and Bruck appears in "Defendant's Supplemental Memorandum in Opposition to Plaintiff's Motion for Summary Judgment" (Doc. # 33) and is attached to this decision as an Appendix. Prior to the ninety-day preferential period, ten payments were received by Bruck from the debtor within a period of three to 129 days of the due date for payment. The average days between the due date and payment was sixty-nine days, and the median number of days was approximately seventy-seven days. The check from Stanley (Canada) was received 105 days after payment was due. Further analysis reveals that three of the ten payments received by Bruck from the debtor during the non-preferential period exceeded 105 days. Thus, the check of Stanley (Canada) was issued later than the average payment by the debtor to Bruck, but was within the range of the parties' customary dealing.

However, the defendant (who pursuant to § 547(g) bears the burden of proving the transfer is within an exception to § 547(b)) has offered no evidence that the *manner* in which the transfer was made, i.e., by joint check from a customer of the debtor, was in the ordinary course of business or otherwise consistent with the course of dealings between the debtor and the defendant. The legislative history to § 547(c)(2) indicates that the purpose of that section is to "leave undisturbed *normal* financial relations ... and to discourage *unusual* action by either the debtor or his creditors...." S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5874. Absent evidence that prior to the preference period Bruck received joint checks from Stanley (Canada), the court regards such a transaction to be unusual and not "ordinary."

As discussed, above, § 547(c)(2)(C) is the objective prong of § 547(c)(2) and requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry. No evidence has been submitted by Bruck regarding the standards for payment prevailing in Bruck's and the debtor's industry. Therefore, Bruck has failed to satisfy its burden of proof on this

issue.[4]

The court finds that the transfer of funds by the Stanley (Canada) check to Bruck was not in the ordinary course of business nor made pursuant to ordinary business terms.

For the foregoing reasons, it is hereby ORDERED that the defendant's motion for summary judgment is GRANTED with respect to the check issued by Stanley (USA) for the reason that such check did not constitute a preferential transfer under § 547(b). It is further ORDERED that the plaintiff's motion for summary judgment is GRANTED with respect to the check issued by Stanley (Canada) for the reason that such check constituted a preferential transfer under § 547(b).

## APPENDIX

| DATE PAID | DATE DUE | AMOUNT PAID | NUMBER OF DAYS LEFT | |
|---|---|---|---|---|
| 2–19–90 | 10–20–89 | $ 4,050.00 | 121 | $38,444.47 |
| 2–19–90 | 10–27–89 | $26,250.00 | 115 | Plaintiff's |
| 2–19–90 | 11–6–89 | $ 1,372.28 | 105 | Preference |
| 2–19–90 | 11–6–89 | $ 6,776.19 | 105 | Claim |
| 10–9–89 | 6–22–89 | $ 2,777.04 | 109 | |
| 10–9–89 | 6–25–89 | $ 222.96 | 106 | |
| 11–1–89 | 8–5–89 | $ 1,420.00 | 88 | |
| 11–1–89 | 8–13–89 | $10,500.00 | 80 | |
| 11–1–89 | 6–25–89 | $ 282.64 | 129 | |
| 12–4–89 | 10–20–89 | $ 8,000.00 | 45 | |
| 12–4–89 | 10–15–89 | $ 198.91 | 50 | |
| 12–21–89 | 12–14–89 | $ 1,920.00 | 7 | |
| 1–2–90 | 12–30–89 | $ 2,660.00 | 3 | |
| 1–2–90 | 10–20–89 | $10,000.00 | 74 | |

4. Although no evidence has been submitted that bears specifically on industry-wide standards of payment, Mr. John Rubinic, vice-president and treasurer of Bruck, stated that the average DSO (days sales outstanding) for Bruck's accounts receivable was approximately fifty days (Deposition, Doc. 25 at 85–86). Thus, even if Bruck's dealings with its other customers are viewed as reflecting upon "ordinary business terms" within Bruck's industry, it is clear that the check issued by Stanley (Canada)—105 days after payment was due—was well in excess of Bruck's average DSO of fifty days, and may not be regarded as "ordinary." In any event, standing alone, evidence of Bruck's dealings with its other customers is insufficient to prove "ordinary business terms" by a preponderance of the evidence. *In re Fred Hawes, supra,* 957 F.2d at 246 n. 7.