### In re U.S.A. INNS OF EUREKA SPRINGS ARKANSAS, INC., Debtor.

### Claude R. JONES, Trustee, Plaintiff,

### v.

### UNITED SAVINGS AND LOAN ASSOCIATION, Defendant.

**Bankruptcy No. 89–13136M.
Adv. No. 89–3509.**

United States Bankruptcy Court,
W.D. Arkansas,
Harrison Division.

Sept. 30, 1992.

Gail Inman–Campbell, Harrison, AR, Dennis L. Davis, Kansas City, MO, for United Sav. & Loan Assn.

Claude R. Jones, Harrison, AR, trustee.

Steven B. Davis, Harrison, AR, for trustee.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On October 10, 1989, U.S.A. Inns of Eureka Springs, Arkansas, Inc., (U.S.A. Inns), filed a voluntary petition for relief under the provisions of chapter 11 of the United States Bankruptcy Code. On November 24, 1989, the debtor-in-possession filed this adversary proceeding against United Savings & Loan Association (United) and others to recover certain preferential transfers pursuant to 11 U.S.C. § 547(b) (1988). United raised the affirmative defense that the transfers it received were made in the ordinary course of business and according to ordinary business terms pursuant to 11 U.S.C. § 547(c)(2) (1988).

On April 10, 1990, this case was converted to a proceeding under the provisions of chapter 7. Claude R. Jones, Esq., was appointed trustee and was subsequently substituted as party plaintiff. On November 11, 1991, a trial was held and the matter was taken under advisement. On December 17, 1991, an order was entered dismissing the complaint as to all defendants except United.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) (1988), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

The essential facts are not in dispute. The original promissory note dated July 31, 1985, was made by Eureka Motel (Eureka) in the original principal sum of $2,700,-000.00. The note provided for repayment in equal monthly installments of $27,-940.00, due on the 30th day of each month. The entire unpaid principal was due July 29, 1992, and the parties contemplated that the note would be renewed and the interest rate adjusted at that time. The note was secured by a first lien on the Eureka Motel located in Eureka Springs, Arkansas, and a first security interest in all its furniture, fixtures, equipment and inventory.

On August 10, 1988, Eureka sold the Eureka Motel to the debtor. This transaction violated a due-on-sale clause contained in the deed of trust. The debtor assumed Eureka's note payable to United; however, United was not aware of the assumption until after the sale was completed. Soon

after United discovered the sale, United met with the debtor's representatives to discuss the loan. Mr. J.C. Benage (Benage), the chairman of the board, president and chief executive officer of United, testified that "after much discussion, and somewhat reluctant[ly] ... we did agree then to allow an assumption of our loan." Record at 11.

On October 10, 1989, when the debtor filed bankruptcy, United's claim against the debtor totaled $2,815,037.65 and was secured by collateral with a fair market value of $2,620,000.00. The parties stipulated that during the ninety-day period prior to the filing of the petition, the debtor made the following payments to United:

| Date | Amount |
|------|--------|
| 7/14/89 | $ 6,538.45 |
| 7/21/89 | 6,461.55 |
| 7/26/89 | 7,000.00 |
| 8/01/89 | 1,845.37 |
| 8/01/89 | 11,154.63 |
| 8/08/89 | 2,642.19 |
| 8/17/89 | 7,357.81 |
| 8/18/89 | 966.30 |
| 8/18/89 | 5,233.70 |
| 8/25/89 | 3,800.00 |
| 9/01/89 | 10,000.00 |
| Total | $63,000.00 |

The following is a list of all other payments made by the debtor to United:

| Date | Amount |
|------|--------|
| 1/04/89 | 3,000.00 |
| 1/05/89 | 23,508.34 |
| 1/31/89 | 15,000.00 |
| 2/17/89 | 6,000.00 |
| 3/24/89 | 5,000.00 |
| 4/04/89 | 5,000.00 |
| 4/18/89 | 5,000.00 |
| 4/26/89 | 4,000.00 |
| 5/02/89 | 5,000.00 |
| 5/09/89 | 8,500.00 |
| 5/18/89 | 2,000.00 |
| 5/19/89 | 2,000.00 |
| 5/23/89 | 3,500.00 |
| 5/30/89 | 6,000.00 |
| 6/01/89 | 1,000.00 |
| 6/13/89 | 5,000.00 |
| 6/16/89 | 2,500.00 |
| 6/23/89 | 10,000.00 |
| 7/05/89 | 10,000.00 |
| 7/10/89 | 7,000.00 |

The parties stipulated that all the elements are present to constitute a prefer-

ence under 11 U.S.C. § 547(b) (1988). However, United asserts the affirmative defense allowed under 11 U.S.C. § 547(c) (1988), which provides:

(c) The trustee may not avoid under this section a transfer—

....

(2) to the extent that such transfer was

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2) (1988).

The legislative history of section 547(c)(2) suggests that the purpose of the ordinary course of business exception is to leave undisturbed normal financial relations between the debtor and the creditor. Ordinary course of business transactions do not detract from the general purpose of the preference section which is to discourage unusual action by either the debtor or his creditors immediately prior to bankruptcy. H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 373, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, and 6329.

A creditor asserting the provisions of section 547(c)(2) as a defense to a preference action has the burden of proof to establish the applicability of the section. 11 U.S.C. § 547(g) (1988). *See First Software Corp. v. Curtis Mfg. Co. (In re First Software Corp.)*, 81 B.R. 211, 212 (Bankr. D.Mass.1988); 4 *Collier on Bankruptcy* ¶ 547.21[5] (15th ed. 1990). United must prove that the loan payments were 1) payments of a debt incurred in the ordinary course of business, 2) made in the ordinary course of business of the debtor and United, and 3) made according to ordinary business terms. 11 U.S.C. § 547(c)(2). The creditor must prove the three elements of section 547(c)(2) by a preponderance of the evidence to escape a preference avoidance. *Logan v. Basic Distribution Corp. (In re*

*Fred Hawes Org.)*, 957 F.2d 239, 242 (6th Cir.1992). The term "ordinary course of business" is not defined in the Bankruptcy Code; therefore, its determination is a factual issue. *First Software Corp.*, 81 B.R. at 213.

The first element United must prove is that the debt was incurred by the debtor in the ordinary course of business or financial affairs of the debtor and United. *See* section 547(c)(2)(A). The debt was incurred by an assumption of an existing debt secured by a mortgage and security interest on the debtor's place of business. Payment on long-term debt may qualify for the ordinary course of business exception to the trustee's power to avoid preferential transfers. *Union Bank v. Wolas*, —— U.S. ——, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). Assumption of a note and mortgage is a typical business transaction. The debt was incurred for the purpose of financing business property. United is in the business of loaning money for such purposes. Therefore, the debt was incurred by the debtor in the ordinary course of business or financial affairs of the debtor and United.

The second element of section 547(c)(2) requires proof that the transfers to United were made in the ordinary course of business or financial affairs of the debtor and United. *See* section 547(c)(2)(B). In determining whether a payment is made in the ordinary course of business, the facts and circumstances surrounding the payments must be considered. The factors include the prior course of dealing between the parties, the timing and amount of the payment, and whether the payment resulted from pressure or any unusual activity by the creditor. *Xtra, Inc. v. Seawinds Ltd. (In re Seawinds Ltd.)*, 888 F.2d 640, 641 (9th Cir.1989); *Newton v. Ed's Supply Co. (In re White)*, 58 B.R. 266, 269 (Bankr. E.D.Tenn.1986). *See* 4 *Collier on Bankruptcy* ¶ 547.10 (15th ed. 1992).

The conduct of the parties involved must be considered to determine what is ordinary with the respect to those parties. *Howison v. Adkin Plumbing & Heating Supply Co. (In re Websco, Inc.)*, 92 B.R. 1, 2 (Bankr.D.Me.1988); *First Soft-*

*ware Corp.*, 81 B.R. at 213. Even if the debtor's business transactions were irregular, they may be considered "ordinary" for purposes of section 547(c)(2) if the transactions were consistent with the course of dealing between the particular parties. *Yurika Foods Corp. v. United Parcel Services (In re Yurika Foods Corp.)*, 888 F.2d 42, 44 (6th Cir.1989); *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989).

Benage testified that the debtor made sporadic and untimely payments on the loan during the entire course of the business relationship. He stated that this pattern of payments was in the ordinary course of business between United and the debtor. Although the assumption agreement provided that United had the right to call the loan if the payments were not made on a timely basis, United was regulated by both state and federal agencies that encourage institutions to work with delinquent customers. Benage explained that "it was in [United's] best interest and the motel's interest to continue in accepting payments of this nature." Record at 17.

On cross-examination, the following questions were elicited from Benage:

Q: All right. If any of the payments that were made during the time period when [the debtor] was paying on this indebtedness, was there ever an ordinary, once-every-month $27,000 monthly payment made?

A: No, sir.

Q: All right. And again, are you here to tell this Court that that schedule where the monthly payment is $27,000 represents the ordinary business terms of repaying a long-term debt in the savings and loan industry?

A: This is the manner in which Mr. Thompson paid us.

Q: Are you saying that's ordinary for United Savings' business, to have a debtor that pays monthly payments of $27,000 on that kind of pay schedule?

A: Well, it could be ordinary on those accounts that where there's default,

delinquency, and there's a workout process, yes, sir.

Q: Is it ordinary for all of your accounts?

A: Well, I think, Counselor, we all know that a good many of our people are fortunate enough to pay every payment and every amount due as established by the contract. But we're talking about an exception here, and some others are exceptions.

Q: How many of those accounts do you have out of your total portfolio? What percentage of your accounts do you have that pay on that kind of pay schedule?

A: Probably eight to ten percent.

Q: Now, you have already testified that the operation of this business was seasonal.

A: That is correct.

Q: And, in fact, what United did, as any good creditor would do, was try to collect the maximum amount that you could during the maximum season for the motel operations, and that was during the summer?

A: We later, I think, restructured the loan so that it would be a seasonal pay loan. Initially, I'm not sure that it was that way with Mr. Drake. So that when the cash is there, when the income is there, that's when they want to make their payments and should make their payments.

Q: Even insofar as these irregular payments reflected on your Defendant's Exhibit Number One, those, in fact, were made during the height of the tourist season in Eureka Springs, weren't they?

A: No, sir. Some of these were made in January and February and March.

Q: And then you collected payments during the summer months?

A: That is correct.

Q: And the, according to your stipulation, you waited until October 4, 1989 to file your foreclosure case in State Court in Eureka Springs; is that correct?

A: When the checks bounced, we assumed that he was finished and had given up and couldn't pay, yes, sir.

Q: And now, you did continue to collect these payments even though your attorney had accelerated the indebtedness in June of 1989?

A: I don't recall if it was accelerated or not, sir. It may well have been. I don't—

Q: It's in the deposition.

A: Okay, that's fine. I understand. And if that's the case, yes, we did go ahead and collect payments.

Record at 25–27.

The Eighth Circuit Court of Appeals construed the provisions of section 547(c) in the recent case of *Lovett v. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991). In *Lovett*, the Court found that payments of trade invoices, even though consistently late according to the printed due date on the invoice, still met the ordinary course of business exception of section 547(c)(2) because late payments were the established practice between the parties.

The facts in this case are indistinguishable from *Lovett* in regard to whether the transfers were made in the ordinary course of business between the parties. The record establishes that the debtor's late payments, and United's acceptance of those late payments, was the ordinary course of business or financial affairs between the two parties. This policy continued from the inception of the relationship until the debtor's checks were returned as insufficient. Only at that time did United bring foreclosure proceedings.

The third element of section 547(c)(2) requires United to prove that the payments were made according to ordinary business terms. *See* section 547(c)(2)(C). This subsection requires an objective determination whether the payments are ordinary in relation to the standards prevailing in the relevant industry. *Logan v. Basic Distribution Corp. (In re Hawes Org.)*, 957 F.2d 239, 244 (6th Cir.1992); *Rieser v. Bruck Plastics Co. (In re Trinity Plastics,*

**492**

*Inc.),* 138 B.R. 203, 209 (Bankr.S.D.Ohio 1992).

 Benage testified that the Office of Thrift Supervision directed United to work with delinquent customers during the "so-called real estate crisis...." Record at 17. He stated that it is regular practice in the savings and loan industry to work with delinquent customers as long as some type of payment is forthcoming. Although United confirmed that this practice may be the general industry standard as to delinquent customers, United introduced no evidence regarding "ordinary business terms" of the industry in general.

In *Lovett,* the Eighth Circuit contrasted the debtor's payment with the industry as a whole. 931 F.2d at 499. There, the evidence established that late payments were so common in the entire trucking industry, the practice was considered "ordinary business." *Id.* Here, United presents no evidence that late note payments are so common within the savings and loan industry that it is considered an ordinary business practice. In fact, Benage testified that at least 90% of United's customers remain current on their note payments. Record at 26. Therefore, United failed to prove that the payments were made according to ordinary business terms.

United has failed to prove one of the three essential elements needed to establish the applicability of 11 U.S.C. § 547(c)(2) (1988). Therefore, pursuant to 11 U.S.C. § 547(b) (1988), the trustee is entitled to a judgment against United for $63,000.00.

IT IS SO ORDERED.